**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 15 |
| MARKEL CATCO REINSURANCE FUND LTD., *et al.*, | Case No. 21-11733 (LGB) |
| Debtors in Foreign Proceedings.[1] | (Joint Administration Requested) |

### DECLARATION OF KEHINDE GEORGE IN SUPPORT OF THE VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVES, AND (III) CERTAIN RELATED RELIEF

Pursuant to 28 U.S.C. § 1746, I, Kehinde George, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.        I am Head of Insolvency and a Director of ASW Law Limited ("**ASW**") and Bermuda counsel for the above-captioned foreign debtors (collectively, the "**Debtors**"), each of which is incorporated under the laws of Bermuda.

2.        As of the date hereof, the Debtors are subject to liquidation proceedings in which provisional liquidators have been appointed for the purpose of restructuring (the "**Provisional Liquidation Proceedings**") under Part XIII of the Companies Act 1981 (as amended, the "**Bermuda Companies Act**"), pending before the Supreme Court of Bermuda (the "**Bermuda Court**").

---

[1]    The Debtors are Bermuda companies registered with the Registrar of Companies in Bermuda. The Debtors' respective registration numbers are as follows: Markel CATCo Reinsurance Fund Ltd. (50599); CATCo Reinsurance Opportunities Fund Ltd. (44855); Markel CATCo Investment Management Ltd. (50576); Markel CATCo Re Ltd. (50602). Each of the Debtors has its registered office located at Crawford House, 50 Cedar Avenue, Hamilton HM11, Bermuda.

3. As set forth in the Verified Petition (defined below), Debtors CATCo Reinsurance Opportunities Fund Ltd. (the "**Public Fund**") and Markel CATCo Reinsurance Fund Ltd. (the "**Private Fund**") contemplate filing subsequent applications for the sanctioning of schemes of arrangement under section 99 of the Bermuda Companies Act (the "**Schemes**") before the Bermuda Court (the "**Scheme Proceedings**," and together with the Provisional Liquidation Proceeding, the "**Bermuda Proceedings**"). The Verified Petition seeks recognition of the Bermuda Proceedings under chapter 15 of title 11 of the United States Code (the "**Bankruptcy Code**").

4. I submit this declaration (this "**Declaration**") in support of the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representatives, and (III) Certain Related Relief* (the "**Verified Petition**"),[2] filed contemporaneously herewith.

5. I am over the age of 18 and, except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my opinion based upon my experience and knowledge of the Debtors and my review of relevant documents or information supplied to me. In preparing this Declaration, I have reviewed (a) the Chapter 15 Petitions for each of the Debtors, (b) the Verified Petition, (c) documents prepared or filed in connection with the Bermuda Proceedings, and (d) relevant provisions of the Bermuda Companies Act and other provisions of Bermuda law as they relate to chapter 15 of the Bankruptcy Code ("**Chapter 15**") and other aspects of U.S. bankruptcy law referred to in this Declaration. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

6. This Declaration comprises matters that are statements of my view of Bermuda law or statements of fact. Where the matters stated in this Declaration are statements regarding

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition.

Bermuda law, such statements represent my view of Bermuda law as a barrister admitted and authorized to practice in Bermuda. Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, they are true. Where the matters stated in this Declaration that are statements of fact that are not within my personal knowledge, they are derived, as appropriate, from documents maintained by the Registrar of Companies of Bermuda, from the records maintained by ASW as a result of advising the Debtors in connection with the Bermuda Proceedings, or from information supplied to me by or on behalf of the Debtors, and are true to the best of my knowledge, information, and belief.

## PROFESSIONAL BACKGROUND

7.     I was admitted as a solicitor of the Supreme Court of England and Wales in September 1985 and was called to the Bermuda Bar in January 1996. I have a Bachelor of Laws Degree with honours (King's College, London, 1982). I was employed as a corporate attorney in firms in the City of London (1983–91) and as a government lawyer in the Department of Trade and Industry of the UK Government, advising on insolvency (1991–95). I emigrated to Bermuda in November 1995 and was employed with the law firm of Milligan-Whyte & Smith (1995–99), before becoming a founding partner in the firm of Attride-Stirling & Woloniecki, the predecessor firm to ASW, in October 1999. My practice within Bermuda since 1995 has been primarily in the fields of corporate restructuring and insolvency and related litigation. I have advised liquidators, provisional liquidators, creditors, shareholders, and regulators in relation to numerous local and cross-border insolvencies and restructurings and schemes of arrangement.

8.     I am a member of the Bermuda Bar Association, INSOL, and a member and sit on the executive committee of the Restructuring and Insolvency Specialists Association (Bermuda branch).

9.      My firm, ASW, has been retained by the Debtors in connection with this matter.

10.     Although I am not a U.S. attorney and thus do not purport to make any statements concerning matters of U.S. law, I am fairly acquainted with Chapter 15.

## STATEMENTS OF BERMUDA LAW AND PRACTICE

### I.      Sources of Bermuda Law

11.     Bermuda is a self-governing British Overseas Territory. In common with other British Overseas Territories and former colonies, English law was introduced to Bermuda at the date of its settlement in 1612. The system of law in Bermuda is therefore founded on the English legal system, although there is a distinct body of Bermudian statutory law and Bermudian case law that has developed over the past 400 years.

12.     Law and equity are administered concurrently, and in any conflict, the rules of equity generally prevail.

### II.     The Bermuda Court System

13.     The Bermuda Court is the court of first instance in Bermuda with unlimited jurisdiction for all civil and commercial disputes with a value in excess of BD$25,000. The Bermuda Court determines any proceedings relating to the affairs of companies incorporated in Bermuda under the Bermuda Companies Act. The Bermuda Court is also responsible for the resolution of insolvency cases in Bermuda.

14.     The Court of Appeal for Bermuda (the "**Court of Appeal**") is the first-tier appellate court in Bermuda, made up of three judges who usually sit in three sessions per year. It entertains appeals from the Bermuda Court.

15.     Appeals against decisions of the Court of Appeal are entertained by the Judicial Committee of the Privy Council (the "**Privy Council**"), which, although based in the United

4

Kingdom, is Bermuda's highest appellate court. The Privy Council is ordinarily made up of a five-judge tribunal that sits in London. Its composition consists of members of the Supreme Court of the United Kingdom (formerly the House of Lords, and the highest appellate court for England and Wales, Scotland, and Northern Ireland), as well as other senior judges from the Commonwealth jurisdictions.

## III.    The Common Law Principle of Precedent Is Applicable in Bermuda

16.    Bermuda law, following English law in this regard, is based upon the common law principle of precedent. Under the doctrine of precedent, certain judicial decisions are "binding" on other judges, and their reasoning or "*ratio decidendi*" must be followed and applied, unless they are properly capable of being distinguished. A judge of the Bermuda Court is bound to follow and apply any relevant decision of the Court of Appeal and any relevant decision of the Privy Council. The Court of Appeal, in turn, is bound by any relevant decision of the Privy Council. Previous relevant decisions of the Privy Council are binding on the Privy Council itself, except in exceptional circumstances. The Privy Council can depart from a previous decision where it is right to do so, when, for example, the previous decision is thought to be wrong, there have been changes or developments to the law, or the previous decision is thought to have led to results which were unjust or contrary to public policy.

17.    Under the doctrine of precedent, certain judicial decisions, or parts thereof (such as *ex parte* rulings or *obiter dicta*), may be "persuasive," and, depending on the facts of the case, the seniority and experience of the tribunal, and the quality of their reasoning, should ordinarily be followed and applied, unless they are plainly wrong or are properly capable of being distinguished. In particular, decisions of the Bermuda Court are persuasive and should generally be followed by other judges of the Bermuda Court.

18.    Further, Bermudian courts often treat English case law as being persuasive for three main reasons.

19.    ***First***, many Bermuda statutes are based upon current or former U.K. legislation. As a result, decisions of the Superior Courts of England and Wales in respect of provisions of U.K. statutory law that are identical to or similar to Bermuda law are considered in Bermuda to be highly persuasive authority.

20.    ***Second***, the decisions of the United Kingdom Supreme Court on matters of common law and statutory interpretation are highly persuasive in Bermuda, since the U.K. Supreme Court, sitting as the highest appellate court for the United Kingdom, and the Privy Council, sitting as the highest appellate court for Bermuda, share common membership. *See De Lasala v De Lasala* [1980] AC 546, 557–58 (PC) (appeal taken from H.K.).

21.    ***Third***, where issues of common law in Bermuda have not been expressly considered by the Bermuda courts, the Bermuda courts often find assistance in the consideration of such issues in reasoned judgments or rulings by judges of the Superior Courts of England and Wales, whether in the High Court of Justice of England and Wales, the U.K. Court of Appeal, or the U.K. Supreme Court. Furthermore, depending on the facts and the circumstances (including the legislative background, the jurisdictional and legal similarities, and the perceived quality of the tribunal and its reasoning), the Bermuda courts often find assistance in the consideration of issues in reasoned judgments by judges of the superior courts of other common law and offshore jurisdictions, such as the British Virgin Islands, the Cayman Islands, Australia, New Zealand, Hong Kong, Singapore, and Canada. In practice, Privy Council decisions, on appeal from other common law jurisdictions, are treated as highly persuasive if the relevant common law or legislation is similar to the law of Bermuda.

IV.     **Bermuda Insolvency Proceedings**

A.      **Provisional Liquidation Proceedings**

22.     As noted above, the Bermuda Court has jurisdiction over the affairs of companies that are incorporated in Bermuda. A compulsory winding-up proceeding is commenced by the filing of a petition with the Bermuda Court seeking a winding-up order which, if granted, results in the liquidation of the company. The liquidation is conducted under the supervision of the Bermuda Court and is, I understand, roughly analogous to a proceeding under chapter 7 of the Bankruptcy Code. The Bermuda Court appoints a liquidator who functions in a similar manner to a chapter 7 trustee.

1.      **Overview and Statutory Framework**

23.     Part XIII of the Bermuda Companies Act is a statutory framework for liquidation proceedings, which sets the priority for payment of debts and interests upon the distribution of a company's assets and gives Bermudian courts the authority to, among other things, (a) stay any action against an insolvent company, (b) vest an insolvent company's assets in a liquidator, (c) require a company's officers or agents to deliver up or otherwise transfer a company's property, including its books and records, to the liquidator, and (d) summon third parties with information about or property of a company or its affairs to be examined, to produce books and papers, and to order their apprehension if they fail to appear.

24.     A petition for a winding-up order may be filed by the company itself or any of its creditors or shareholders. Companies Act 1981 § 163(1) (Berm.).

25.     The Bermuda Court has jurisdiction to grant a winding-up order on any of eight separate grounds, including that:

> (a)     the company (*i.e.*, its shareholders) has resolved that the company shall be wound up by the court;

(b)    the company is unable to pay its debts, taking into account contingent and prospective liabilities; and

(c)    the court is of the opinion that it is just and equitable that the company be wound up.

26.    One or more provisional liquidators may be appointed in a compulsory winding-up immediately after the presentation of the petition for a winding-up order and before the making of such a winding-up order. If a provisional liquidator is not appointed prior to the making of a winding-up order, one will be appointed upon the making of the winding-up order. Usually, a provisional liquidator will remain in office until the Bermuda Court appoints a permanent liquidator following separate meetings of the shareholders and creditors of the company held after the making of a winding-up order, at which time they vote on who the permanent liquidator should be. In practice, the person acting as provisional liquidator will usually be appointed as permanent liquidator.

27.    Pursuant to section 167(4) of the Bermuda Companies Act, the appointment of a provisional liquidator or the making of a winding-up order brings into effect an automatic statutory stay of actions and proceedings against the company, with the effect that actions may not be commenced or continued against the company without leave of the Bermuda Court and subject to such terms as the Bermuda Court may impose. From what I understand of U.S. law, this stay is similar to the automatic stay provided for under Bankruptcy Code section 362. Pursuant to section 166(1) of the Bermuda Companies Act, any disposition of the property of a company made after the presentation of a petition for the winding-up of the company is void unless approved by the Bermuda Court.

28.    There are other important statutory provisions that come into play in a liquidation. Present and former officers of the company are obliged to give information to the provisional liquidator. They and any other party with information regarding the affairs or property of the

8

company can, if the Bermuda Court so orders, be required to answer written or oral questions under oath. *See* Companies Act 1981, § 195(1), (2) (Berm.). The Bermuda Court can also order summary turnover of assets or documents of the company to the provisional liquidator. *See id* §§ 186, 195(3).

### 2.    Powers and Duties of Provisional Liquidators

29.    The powers and duties of a provisional liquidator are the powers of a liquidator under the Bermuda Companies Act, but may be prescribed and limited by the terms of the order appointing them. A provisional liquidator is an officer of the Bermuda Court that is subject to the control and supervision of the Bermuda Court, and, when a provisional liquidator is appointed prior to the making of a winding-up order, their role is usually to ascertain, oversee, and preserve the assets of the company pending the resolution of the winding-up petition, for the benefit of creditors or members (*i.e.*, equity holders). A provisional liquidator may be appointed prior to the making of a winding-up order with limited "light-touch" powers for the purposes of facilitating a restructuring, while the management of the company remains in control of the company, subject to the oversight of the provisional liquidator. A provisional liquidator is required to be independent from the management of a company and its creditors or members and is required to act in an even-handed fashion between creditors or members or groups of creditors or members (*i.e.*, for the benefit of the company's creditor or shareholder body as a whole and not just a single creditor or member or group of creditors or members) and in accordance with the terms of the order appointing them. They are required to act fairly and honourably and may be required to forgo strict legal rights if they are incompatible with moral justice and honest dealings. *See Ex Parte James* (1873–74) LR 9 Ch. App. 609, 614, *applied, e.g.*, *In re Wyvern Devs. Ltd.* [1974] 1 WLR 1097. Provisional liquidators must seek approval of their fees from the Bermuda Court.

30.    A provisional liquidator may be removed by the Bermuda Court for cause. Any creditor or shareholder may apply to the Bermuda Court with respect to any exercise or proposed

exercise of any of the powers of the liquidator under the Bermuda Companies Act, section 175(3), and any person who is dissatisfied by any act, omission, or decision of the liquidator may apply under the Bermuda Companies Act, section 176(5), to the Bermuda Court, which may reverse or modify such act. The provisional liquidator may apply for directions from the Bermuda Court under the Bermuda Companies Act, section 176(3).

### B.    Schemes of Arrangement Under the Laws of Bermuda

31.    A scheme of arrangement is a statutory process under sections 99 and 100 of the Bermuda Companies Act whereby a compromise or arrangement between a company and its creditors or members (or any classes of its creditors or members) can become binding on the company and all of its affected creditors or members if (a) approved at a Bermuda Court-directed meeting(s) by a majority in number, representing at least 75% in value, of those present and voting at the meeting(s) of each class of affected creditors or members and (b) sanctioned by the Bermuda Court.

32.    A scheme of arrangement under the Bermuda Companies Act, like an English scheme of arrangement, is a flexible mechanism that can be used to encompass a large variety of compromises or arrangements between a company, whether solvent or insolvent, and its creditors or members. A scheme of arrangement is a useful tool for restructuring all or a certain part of a company's debt or effecting an agreement among the company and its creditors or members. A company does not need to be insolvent, or near insolvency, to propose and implement a scheme of arrangement. In fact, schemes of arrangement under section 99 of the Bermuda Companies Act are the current typical manner used to implement solvent restructurings in Bermuda.

33.    A compromise or arrangement of the type envisaged here has the effect of discharging liabilities of the company concerned and, therefore, can facilitate the winding-up or restructuring of a company, as applicable.

34.     The Bermuda Companies Act requires the following to occur in order for a scheme of arrangement to become legally binding on the company and on all of the creditors or members to whom it applies:

(a)     the convening by the Bermuda Court of meeting(s) of the class or classes of creditors or members affected by the scheme of arrangement to vote on its approval;

(b)     the issuance of an "explanatory statement" (which I understand to be similar to a disclosure statement under the Bankruptcy Code) to the affected creditors or members explaining the effect of the scheme of arrangement and addressing certain other statutory requirements;

(c)     notification to affected parties of the date and time of the court-directed scheme meeting(s);

(d)     the approval of the scheme of arrangement by a majority in number representing at least 75% in value of the class or classes of creditors or members present and voting in person or by proxy at the scheme meeting(s) convened for such purpose;

(e)     the sanction of the scheme of arrangement by the Bermuda Court following a full hearing (which I understand to be similar to a confirmation hearing under the Bankruptcy Code) of a petition to sanction the scheme; and

(f)     the delivery of a copy of the order of the Bermuda Court sanctioning the scheme to the Registrar of Companies within such period as may be specified by order of the Bermuda Court or the scheme itself.

35.     A scheme of arrangement cannot be sanctioned by the Bermuda Court unless the Bermuda Court is satisfied, among other things, that (a) the scheme of arrangement is in all circumstances fair and reasonable and (b) the classes of creditors or members voting in respect of the scheme of arrangement have been properly constituted. *See In re Telewest Commc'ns Plc* [2004] EWHC 1466 (Ch), [36]–[40]. Without the Bermuda's Court sanction of a scheme, a company cannot implement such scheme.

### 1.      Practice Statement Letter, Application, and Convening Order

36.      The scheme process begins when a company (a) issues a practice statement letter in accordance with Circular No. 18 of 2007 of the Bermuda Court to the creditors or members affected by the scheme (this being a requirement for creditors' schemes only) and then (b) submits an application to the Bermuda Court seeking a hearing of the Bermuda Court to convene a scheme meeting(s) of the relevant class or classes of the company's creditors or members proposed to be subject to the scheme to enable such parties to consider and vote on the proposed scheme of arrangement.

37.      The purpose of a practice statement letter is to inform the creditors or members subject to the scheme of (i) the company's intention to promote a scheme, (ii) the purpose that the scheme is designed to achieve, (iii) the class composition of the creditors or members subject to the scheme for the purpose of voting on the scheme at the scheme meeting(s), and (iv) a company's intention to apply to the Bermuda Court to seek an order convening a meeting or meetings of the creditors or members subject to the scheme for the purpose of voting on the scheme. Applications for a convening order at a convening hearing are usually made *ex parte*. However, scheme creditors will be put on notice that a convening hearing is scheduled to occur through a practice statement letter, and such notice may also be given to members in a relation to a members' scheme convening hearing.

38.      In designating and determining the appropriate class or classes of creditors or members for the purpose of voting on a scheme of arrangement, a company must consider whether the rights of the creditors or members within such class are not so dissimilar with respect to the company, both as such rights exist before the scheme and afterwards, so as to make it impossible for them to consult together in relation to the proposed compromise or arrangement with a view to their common interest. *See* Circular No. 18 of 2007 (Berm.); *In re Hawk Ins. Co Ltd* [2001] EWCA

Civ 241, [26]; *In re UDL Holding Ltd* [2002] 1 HKC 172, 185–94 (Lord Millett NPJ); *In re T&N Ltd.* (No. 4) [2006] EWHC 1447 (Ch), [85]–[87]; *In re Lehman Bros. Int'l (Eur.) (Admin.)* [2018] EWHC 1980 (Ch), [70].

39.     At a convening hearing, the Bermuda Court will consider the composition of the proposed class or classes of creditors or members, the nature of the proposed restructuring, and the contents of the explanatory statement prior to making an order convening any scheme meeting.

### 2.     Notice of Scheme Meetings and Explanatory Statement

40.     Once an order convening the scheme meeting(s) has been issued, notice of the scheme meeting(s) must be given to all affected creditors or members prior to the meeting(s) in accordance with that order and the Bermuda Companies Act. Such notice must be accompanied by an explanatory statement that contains sufficient information regarding the company and explaining the effect of the scheme of arrangement following consummation, so as to allow a typical creditor or member to make a reasonable decision whether or not to support the proposed scheme of arrangement. *See* Companies Act § 100(1); *In re APP China Grp. Ltd.* [2003] Bda LR 50. The explanatory statement provides disclosure regarding the procedures to take place in the scheme. In particular, it must set out information regarding the proposals for the scheme, the affected creditors or members, the constitution of the creditor or member class or classes, material interests of directors, the scheme meeting or meetings, voting, and guidance on how scheme creditors or members may participate in the scheme of arrangement. I understand and have been advised by Skadden, Arps, Slate, Meagher, & Flom LLP, U.S. counsel (the "**U.S. Counsel**") to Simon Appell of AlixPartners UK LLP and John C. McKenna of Finance & Risk Services Ltd., in their capacities as the joint provisional liquidators and authorized foreign representatives of the Debtors (in such capacities, the "**JPLs**" or the "**Foreign Representatives**"), that an explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy

Code for solicitation of votes on a chapter 11 plan. Creditors or members are entitled to attend the scheme meeting in person, by authorized representative (if a corporate entity) or by proxy and may ask the scheme meeting's chairperson questions regarding the proposed scheme of arrangement and raise objections which must be recorded in the report of the meeting submitted to the Bermuda Court by the chairperson of the meeting.

### 3.    Voting

41.    As noted above, each class of affected creditors or members will consider and vote on the proposed schemes of arrangement. Similar to U.K. schemes, Bermuda schemes require a majority in number representing at least 75% in value of those present and voting in person or by proxy at the scheme meeting of each class or classes of creditors or members to vote in favour of the scheme of arrangement in order for the Bermuda Court to have jurisdiction to sanction the scheme of arrangement. If any class of affected creditors or members does not approve the scheme (by the requisite majorities described in the foregoing sentence), the scheme cannot be sanctioned by the Bermuda Court and will not take effect. In other words, nonconsenting affected creditors or members can be bound by the terms of a scheme of arrangement only if all of the classes of affected creditors or members vote by the requisite majorities in favour of the scheme. Thus, unlike the confirmation provisions of chapter 11 of the Bankruptcy Code, as explained to me by U.S. Counsel, cross-class cramdown is not permissible.

42.    The voting majorities are confirmed by the chairperson at the scheme meeting(s). To confirm the voting majorities, the chairperson tabulates the votes of affected scheme creditors or members submitted at each scheme meeting. The chairperson is often assisted in this task by an adviser appointed specifically to assist the company with, among other things, the task of tabulating votes. If the requisite majorities of attending and voting creditors or members approve

the scheme of arrangement, the chairperson provides a report and sworn statement as evidence thereof.

### 4.      Bermuda Court Sanction of Schemes of Arrangement

43.      Assuming the requisite majorities have been obtained at the scheme meetings, a company must petition the Bermuda Court to sanction the scheme of arrangement at a sanction hearing for it to become binding on all of the affected scheme creditors or members, whether or not they voted in favour of the scheme of arrangement. I understand and have been advised by U.S. Counsel that a sanction hearing is comparable to a confirmation hearing on a chapter 11 plan of reorganization under Bankruptcy Code section 1128. Similar to a confirmation hearing, at a sanction hearing all of the creditors or members of a company who are intended to be bound by the scheme have, subject to compliance with the Bermuda Court's directions, an opportunity to raise objections to the scheme of arrangement and to present evidence, which is consistent with U.S. standards of due process.

44.      Following the sanction hearing, the Bermuda Court may sanction a scheme of arrangement unconditionally, sanction a scheme of arrangement conditionally upon certain modifications or amendments to the scheme of arrangement, or refuse to sanction the scheme of arrangement.

45.      The Bermuda Court will consider five criteria in exercising its discretion as to whether or not to sanction a scheme. *See In re Telewest Commc'ns Plc* [2004] EWHC 1466 (Ch). In particular, the Bermuda Court must be satisfied that:

(a)      sufficient steps have been taken to identify and notify all interested parties;

(b)      the statutory requirements and all directions of the Bermuda Court have been complied with;

(c)      the class or classes of creditors or members are properly constituted;

15

(d)      no issue of coercion must arise; and

(e)      the compromise or arrangement proposed under the scheme of arrangement is such that an intelligent and honest man, being a member of the relevant class of scheme creditors or members concerned and acting in respect of his interests, might reasonably approve it.

46.      Further, the Bermuda Court will not sanction a scheme of arrangement unless it is satisfied that the scheme is in all circumstances fair and reasonable. *See id.* at [38]; Circular No. 18 of 2007 (Berm.); *In re Hawk Ins. Co. Ltd.* [2001] EWCA Civ 241; *In re UDL Holding Ltd.* [2002] 1 HKC 172, 185–94 (Lord Millett NPJ); *In re T&N Ltd.* [2006] EWHC 1447 (Ch), [85]– [87]; *In re Lehman Bros. Int'l (Eur.) (Admin.)* [2018] EWHC 1980 (Ch), [70]. In addition, the Bermuda Court will not sanction a scheme that is *ultra vires*. *See In re Oceanic Steam Navigation Co. Ltd.* [1939] 1 Ch 41. The Bermuda Court does not judge the business merits of proposed schemes and generally refrains from second-guessing commercial decisions made at a scheme meeting or meetings.

47.      If the Bermuda Court issues a sanction order sanctioning a scheme of arrangement, the scheme will only take effect once a copy of the Bermuda Court's order sanctioning the scheme has been delivered to the Bermuda Registrar of Companies. Upon such delivery, the scheme is binding and effective on all affected creditors or members according to its terms, irrespective of whether such creditor or member (a) actually received notice pursuant to the methods of notice required by and approved in the convening order, (b) participated at any scheme meeting, or (c) voted at any scheme meeting. The ultimate legal effect of the arrangement envisaged by the scheme of arrangement can, in limited circumstances, be subject to additional conditions as agreed to between the company and its creditors or members as part of the scheme of arrangement.

**5.      Similarity to Schemes of Arrangement Under the Laws of the United Kingdom**

48.      The provisions of the Bermuda Companies Act governing schemes of arrangement under the laws of Bermuda are modeled after and similar to the provisions of the laws of the United Kingdom governing schemes of arrangement, which are set forth in Part 26 of the UK Companies Act 2006. Indeed, sections 99 and 100 of the Bermuda Companies Act were copied from the UK Companies Act 1948, a predecessor to the UK Companies Act 2006. Part XIII of the Bermuda Companies Act and the Companies (Winding-Up) Rules 1982 were also modeled after the UK Companies Act 1948 and related statutory rules.

49.      Courts in Bermuda have recognized how closely the relevant provisions of the Bermuda Companies Act and the UK Companies Act 2006 parallel each other. As a result, decisions of the courts of England and Wales regarding schemes of arrangement under the UK Companies Act 2006 and its predecessors have persuasive effect before the Bermuda Court. *See, e.g.*, *In re APP China Grp. Ltd.* [2003] Bda LR 50.

**V.      Situs of Shares in a Bermuda Company**

50.      The situs of shares in a Bermuda company is at the registered office of the company at which its register of members is kept. *See Int'l Credit and Inv. Co. (Overseas) Ltd. and Another v. Adham and Others* [1994] 1 BCLC 66. Section 65(2) of the Bermuda Companies Act provides that a company's register must be kept at its registered office. The situs of shares in a Bermuda company is therefore Bermuda. *See id.*

**BACKGROUND**

**I.      Overview of the Debtors**

51.      Each of the Debtors is incorporated in Bermuda and each has its registered office located at Crawford House, 50 Cedar Avenue, Hamilton, HM11, Bermuda.

17

52.     I have been apprised that:

(a)     The physical location of the Debtors' headquarters is in Bermuda and the Debtors maintain offices in no other locations.

(b)     The Debtors' central administration, management, and control takes place in Bermuda, and all key management decisions are generally made there. Further, all board meetings of the Debtors are typically held telephonically, but a majority of the Debtors' board members reside in Bermuda. Mr. McKenna, who resides in Bermuda, and Mr. Appell have monitored the Debtors' affairs since their appointment as JPLs, pursuant to the JPL Appointment Orders. In addition, the powers of the orders, include, but are not limited to, evaluating and providing critical input on the proposed Restructuring, and supporting filings and applications to the Bermuda Court.

(c)     The primary assets of the Public Fund, the Private Fund, and the Reinsurer include amounts held in bank accounts held with HSBC in Bermuda. Further, the Debtors maintain the majority of their bank accounts in Bermuda. The Manager's primary assets include 100% of the voting stock of the Reinsurer and the Private Fund. The other Debtors also directly or indirectly hold shares in the Reinsurer.

Appell Decl. ¶ 55.

## II.     The Bermuda Proceedings

53.     On September 27, 2021, the Debtors commenced the Provisional Liquidation Proceedings by filing winding-up petitions, true and correct copies of which are attached as **Exhibits A-1** to **A-4** hereto (the "**Winding-Up Petitions**"), with the Bermuda Court and making applications seeking the appointment of the JPLs as joint and several provisional liquidators of the Debtors with limited "light-touch" powers.

54.     On October 1, 2021, the Bermuda Court made the JPL Appointment Orders, copies of which are attached to the Chapter 15 Petitions as Exhibit A, appointing Simon Appell and John C. McKenna as the JPLs. The JPL Appointment Orders mandated that the JPLs are to, among other things, monitor, consult with, and oversee the Debtors' existing boards of directors. As such, while the Debtors' existing boards of directors remain in place, the JPLs will provide a supervisory role and in that capacity ensure that stakeholders' interests are considered. The JPL Appointment

Orders also appointed the JPLs as the Debtors' foreign representatives and authorized them to seek

recognition of the Bermuda Proceedings under Chapter 15.

55.     I understand that the Debtors intend to commence the Scheme Proceedings to

implement the buy-out transaction that Markel Corporation has decided to make available to the

Public Fund and the Private Fund (the "**Buy-Out Transaction**" and the implementation of such

Buy-Out Transaction, the "**Restructuring**") contemplated by the Schemes in the near term.

### III.     The Chapter 15 Cases

#### A.     The Bermuda Proceedings Are "Foreign Proceedings."

56.     I am advised by U.S. Counsel that "foreign proceeding" is defined in section

101(23) of the Bankruptcy Code to mean:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

57.     Although the application of section 101(23) of the Bankruptcy Code is ultimately

a question of U.S. law on which I am not qualified to opine, based on my reading of the language

of the section, I believe that both the Provisional Liquidation Proceedings and the contemplated

Scheme Proceedings would fall within it.

#### 1.     Each of the Bermuda Proceedings Is a "Proceeding."

58.     Both provisional liquidation proceedings and schemes of arrangement are

proceedings in Bermuda governed by the Bermuda Companies Act, a statutory framework that, as

set forth above, constrains a company's actions, regulates the final distribution of a company's

assets, and includes acts and formalities set down in law so that courts, merchants, and creditors

know them in advance.

**2.**     **The Bermuda Proceedings Are Judicial or Administrative in Character.**

59.     Similarly, provisional liquidation proceedings and schemes of arrangement are both judicial and administrative in character. As set forth above, under Bermuda law, provisional liquidators are officers of the Bermuda Court and their role is usually to ascertain, oversee, and preserve the assets of a company. In addition, they are required to be independent from management and the company's creditors and other stakeholders and are required to behave in an even-handed fashion among creditors and other stakeholders.

60.     The exercise of the JPLs' power is subject to the control and supervision of the Bermuda Court. Thus, while many of a liquidator's tasks are administrative in nature (*e.g.*, collecting, protecting, and realizing assets, reporting to the court and to creditors or members), provisional liquidation proceedings and scheme proceedings are also judicial in character because they are conducted before and under the supervision of the Bermuda Court.

61.     Moreover, the proposed Scheme Proceedings are also judicial in character because there will be significant judicial involvement in the scheme process. As noted above, there will be a convening hearing, scheme meetings, and a sanction hearing for the proposed Schemes. Further, before the Bermuda Court sanctions a scheme of arrangement, it must be satisfied that the compromise or arrangement proposed thereunder is such that an intelligent and honest man, being a member of the relevant class of scheme creditors or members concerned and acting in respect of his interests, might reasonably approve it. Without the Bermuda Court's sanction, the Debtors cannot implement the proposed Schemes.

**3.**     **The Bermuda Proceedings Are Collective in Nature.**

62.     Provisional liquidation proceedings and schemes of arrangement are also collective in nature and provide due process to all parties whose rights and interests will be directly impacted

by them, as explained above. Provisional liquidation proceedings and scheme proceedings are collective proceedings because they are conducted for the benefit of a company's creditor or member body as a whole (or the whole class or classes of creditors or members intended to be bound by the scheme), and not just a single creditor or member. Provisional liquidators have the duty to obtain and protect a company's property pursuant to the provisions of the Bermuda Companies Act, which further reflects the collective nature of Bermuda liquidation proceedings generally. The Bermuda Proceedings will be utilized to implement the restructuring pursuant to the proposed Schemes, which will be a Bermuda Court-supervised arrangements between the Debtors and their stakeholders.

63.     Those parties that will be bound by the Schemes will be entitled to vote on the Schemes at the scheme meetings convened by order of the Bermuda Court, and are entitled to be heard at both the convening hearing and the sanction hearing. Moreover, no matter whether or how an individual stakeholder may have voted, the Schemes are intended to deal with stakeholders collectively, rather than any single stakeholder alone. Indeed, once the Schemes are implemented, subject to entry and delivery of the order sanctioning the Schemes to the Bermuda Registrar of Companies and satisfaction of all conditions precedent to the Restructuring, they will be binding on all stakeholders.

### 4.     The Bermuda Proceedings Are Located in a Foreign Country.

64.     The Bermuda Proceedings are or, in the case of the Scheme Proceedings once commenced, will be located in Bermuda. The Provisional Liquidation Proceedings are currently pending before the Bermuda Court, the court responsible for the resolution of insolvency cases in Bermuda. Further, the proposed Scheme Proceedings will also be commenced in and subject to the jurisdiction of the Bermuda Court.

5.      **The Bermuda Proceedings Are Authorized or Conducted Under a
        Law Related to Insolvency or the Adjustment of Debts.**

65.      The Bermuda Proceedings currently are or are contemplated to be authorized and

conducted under the Bermuda Companies Act, which is the Bermudian law that governs the

insolvency of companies in Bermuda. As noted above, a liquidation proceeding is not only

conducted under Bermuda's general insolvency law, the Bermuda Companies Act, but also

pursuant to the Companies (Winding-Up) Rules 1982 and Bermuda common law principles, which

are similar to the English Companies Act 1948, related statutory rules, and English common law.

66.      Further, a scheme of arrangement under the Bermuda Companies Act, like an

English scheme, is a flexible mechanism that can be used to encompass a large variety of

compromises or arrangements between a company and its stakeholders. In particular, a scheme of

arrangement is a useful tool for restructuring all or a certain part of a company's debt or otherwise

effecting an agreement among a company and its creditors or members.

6.      **Under the Bermuda Proceedings, the Debtors' Assets and Affairs Are
        To Be Subject to the Control or Supervision of a Foreign Court.**

67.      The Debtors' assets and affairs are to be subject to the control of the Bermuda Court

during the Bermuda Proceedings. As noted above, the JPLs' powers are subject to the control and

supervision of the Bermuda Court. Under the JPL Appointment Orders, the JPLs are also to

provide a written report to the Bermuda Court from time to time and as the JPLs consider

appropriate or as the Bermuda Court may otherwise request. *See* JPL Appointment Orders ¶ 3(e).

All parties that are intended to be bound by the Schemes will have the opportunity to seek the

assistance of the Bermuda Court by raising objections at the convening hearing or the sanction

hearing. The Bermuda Court also possesses the authority to sanction (or decline to sanction) a

scheme following the sanction hearing, and thereby determine whether or not the Debtors will

obtain the relief sought.

**7.    The Foreign Proceedings Are for the Purpose of Reorganization or Liquidation of the Debtors.**

68.    Finally, the purpose of Bermuda provisional liquidation proceedings and schemes of arrangement is liquidation or, as contemplated here, reorganization and, specifically, to effect an agreement among the company and its creditors and/or members. I understand that the purpose of the Bermuda Proceedings is a fair and equitable distribution of the Debtors' assets to their stakeholders through the Restructuring to be effectuated by the Schemes. *See* Appell Decl. ¶ 41. I understand further that the JPLs are administering the Bermuda Proceedings together with the Debtors for the purpose of providing a stable platform for them to carry out the Restructuring. Appell Decl. ¶ 41.

**B.    The Foreign Proceedings are "Foreign Main Proceedings"**

69.    I am also advised by U.S. Counsel that a "foreign main proceeding" is a foreign proceeding pending in a country where a debtor has the centre of its main interests.

70.    I understand from U.S. Counsel that in addition to giving a presumption in favour of a debtor's registered office (which, here, as noted above, is Bermuda for all of the Debtors), courts have identified various factors relevant in identifying a debtor's center of main interests, including, among other things, (a) the location of a debtor's headquarters (which, here, as noted above, is Bermuda for all of the Debtors); (b) the location of those persons or entities that actually manage a debtor (which, here, as noted above, is Bermuda for the management, a majority of the board members, and one of the JPLs for each of the Debtors); and (c) the location of a debtor's primary assets (which, here, in addition the Debtors' bank accounts in Bermuda, the primary assets of the Public Fund, the Private Fund, and the Reinsurer include amounts held in bank accounts held with HSBC in Bermuda, and the primary asset of the Manager is the voting stock it holds in the Reinsurer and the Private Fund). As set forth above, the situs of shares in a Bermuda company

23

is at the registered offices of the company at which its register of members is kept. The situs of shares in a Bermuda company is therefore Bermuda.

### C.   The JPLs Are "Foreign Representatives."

71.   I am also advised by U.S. Counsel that "foreign representative" is defined in Bankruptcy Code section 101(24) to mean:

> a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

72.   Again, the application of Bankruptcy Code section 101(24) is ultimately a question of U.S. law on which I am not qualified to opine, but, in my view, the JPLs constitute "foreign representatives" based on a plain reading of the language of the section.[3] Under Bermuda law, they have been appointed by the Bermuda Court on an interim basis to oversee and assist in the reorganization of the Debtors' affairs, and they have been authorized by the Bermuda Court to, among other things, seek recognition under chapter 15 of the United States Bankruptcy Code. Specifically, the JPLs were authorized by the JPL Appointment Orders to, among other things, to seek any relief available to a "foreign representative" under chapter 15 of the U.S. Bankruptcy Code, including commencing the Chapter 15 Cases, filing petitions and any other documents, motions, affidavits, or similar documents, and otherwise seeking assistance from the bankruptcy courts, including recognition and enforcement under the provisions of the Bankruptcy Code of any order entered by the Bermuda Court in relation to the Restructuring; and to take such other action

---

[3]   I am advised by U.S. Counsel that the Bankruptcy Code creates a presumption if the decision commencing the foreign proceeding and appointing the foreign representative indicates that the person or body is a "foreign representative." Here, as noted above, the JPL Appointment Orders indicate that the JPLs are "foreign representatives."

in the United States of America or elsewhere as deemed necessary or appropriate in furtherance and support of the Restructuring. JPL Appointment Orders ¶ 3(j).

**WHEREFORE**, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: Hamilton, Bermuda
   October 5, 2021

        */s/ Kehinde George*
        Kehinde George

**EXHIBIT A-1**

**Winding-Up Petition of Markel CATCo Reinsurance Fund Ltd.**

IN THE SUPREME COURT OF BERMUDA
COMMERCIAL COURT
COMPANIES (WINDING UP)
2021: No.

IN THE MATTER OF MARKEL CATCO REINSURANCE FUND LTD.
AND IN THE MATTER OF THE COMPANIES ACT 1981
AND IN THE MATTER OF THE SEGREGATED ACCOUNTS COMPANIES ACT 2000

---

PETITION

---

**THE HUMBLE PETITION** of Markel CATCo Reinsurance Fund Ltd. (the "**Company**" or the "**Petitioner**") showeth as follows:

## I.   INTRODUCTION

1.   The Company was incorporated under the Companies Act 1981, as amended (the "**Companies Act**"), on 14 September 2015 as an exempted company.  The Company was registered as a segregated accounts company under the Segregated Accounts Companies Act 2000, as amended (the "**SAC Act**"), on 9 November 2015.  The Company is regulated as an authorised institutional fund by the Bermuda Monetary Authority (the "**BMA**"), pursuant to the Investment Funds Act 2006, as amended.

2.   The registered office of the Company is at Crawford House, 50 Cedar Avenue, Hamilton HM11, Bermuda.

3.   The authorised share capital of the Company is US$ 10,001.00 divided into 100 ordinary voting shares of par value US$ 0.01 each and 100,000,000 non-voting preference shares of par value US$ 0.0001 each.

4.   The Company's objects and powers are unrestricted.

## II.   BACKGROUND TO THE COMPANY AND ITS OPERATION

5.   The Company was incorporated for the purpose of, among other things, carrying on the business of a mutual fund within the meaning of section 156A of the Companies Act.

1

650559

6.    In 2015, Markel Corporation, an entity incorporated in the Commonwealth of Virginia, United States of America ("**Markel Corporation**"), acquired the insurance linked securities business operated by CATCo Investment Management Limited, a Bermuda incorporated company.   As a result of this acquisition, Markel CATCo Investment Management Ltd. (the "**Manager**") was incorporated on 2 September 2015 in order to take over the role of CATCo Investment Management Limited and to manage the investments of CATCo Reinsurance Opportunities Fund Limited (also a mutual fund company) (the "**Public Fund**") and the Company (as newly established).   Within this structure, the Company is referred to as the "**Private Fund**".   References in this Petition to the Private Fund are to the Company.

7.    From 2015 to 2019, the Manager managed a reinsurance and retrocessional reinsurance business (the "**Markel CATCo business**").   Under the Markel CATCo business capital was raised by soliciting investments through a fund structure operated by the Company and the Public Fund, in accordance with the CATCo Group's (as defined below) offering documents, with such investor capital ultimately invested in Markel CATCo Re Limited (the "**Reinsure**r"), by way of the segregated accounts operated by the Company subscribing for shares in the Reinsurer.   Each class of shares issued by the Reinsurer was linked to specific reinsurance products, as described further below.

8.    The Manager, Company, Public Fund and Reinsurer are referred to collectively as the "**CATCo Group**" or the "**Companies**".   Further detail in respect of each of the Companies, including a simplified structure chart illustrating the current corporate and fund structure of the CATCo Group, is set out in the first affidavit of Federico Alejandro Candiolo dated 27 September 2021, filed in support of this winding-up petition (the "**Candiolo Affidavit**").

9.    The Reinsurer is registered with the BMA as a Class 3 Insurer under the Insurance Act 1978.   As part of the Markel CATCo business, the Reinsurer provided catastrophic risk reinsurance and retrocessional ("**retro**") reinsurance to its clients, covering extraordinary losses incurred in respect of certain regions and certain natural disasters within a defined time period, usually a calendar year.   The Reinsurer was funded by investor capital raised

2

directly by the Private Fund, and raised indirectly by the Public Fund on the Specialist Fund Segment of the London Stock Exchange (with secondary listing on the Bermuda Stock Exchange), pursuant to the investment structure described in outline at paragraph 7 above.  The reinsurance policies issued by the Reinsurer were, and those that remain subject to the reinsurance run-off process are, fully collateralised, meaning that the Reinsurer held and continues to hold cash and cash equivalent assets in a separate trust account for each reinsurance contract equivalent to the full potential liability under the contract.  The collateral comprised the premium paid by the reinsurance clients, plus an allocation of the proceeds of investments from the Private Fund and, indirectly, the Public Fund.

10.    In respect of the structure of investments in the Markel CATCo business, in summary, private investors would invest directly through the Private Fund and public and institutional investors invested in the Public Fund, which in turn invested directly in the Private Fund. In essence, therefore, the Public Fund operated as a "feeder fund" through which public and institutional investors were able to invest indirectly in the Master Fund, a segregated account of the Private Fund (as described at paragraph 12 below).

11.    The Manager entered into management agreements with each of the Private Fund, the Public Fund and the Reinsurer (the "**Management Agreements**") under which the Private Fund, the Public Fund and the Reinsurer provided broad indemnities to the Manager and its affiliates and others in respect of claims arising out of the Manager's performance of its duties under the Management Agreements, other than claims for negligence, gross or wilful negligence, wilful default, fraud and dishonesty (depending on the particular wording used in each Management Agreement).  Further detail in respect of the Management Agreements is set out in the Candiolo Affidavit.

### III.    FUND STRUCTURE OPERATED BY THE COMPANY

12.    The Company operates eight funds, namely: (i) Master Fund; (ii) Diversified Fund II; (iii) Limited Diversified Arbitrage Fund; (iv) Diversified Arbitrage Fund; (v) GTL Diversified Fund; (vi) Markel Diversified Fund; (vii) QIC Diversified Fund; and (viii) Aquilo Fund (collectively, the "**Funds**", and each, a "**Fund**").  The Funds are segregated accounts of

3

the Company, meaning that each Fund is a separate individually managed pool of assets with its own investment objective and policies.

13. Excluding the Aquilo Fund, the other seven Funds are connected, with each of (i) Diversified Fund II; (ii) Limited Diversified Arbitrage Fund; (iii) Diversified Arbitrage Fund; (iv) GTL Diversified Fund; (v) Markel Diversified Fund; and (vi) QIC Diversified Fund, in that each of (ii) through (vii) holds investments in the Master Fund. These six Funds, plus the Master Fund, are collectively referred to as the "**Retro Funds**".

14. The funds and investments operated by the Private Fund can be broadly divided into two categories: (i) the investments in, and investments made by, the Aquilo Fund; and (ii) the investments in, and investments made by, the Retro Funds.

## IV.   SHARE RIGHTS

### A.   The Share Series and Sub-Series

15. The Company has issued a separate class of participating shares in respect of each Fund, holders of which are only entitled to the proceeds of the Fund to which their shares relate. The assets of each segregated account are intended to be available to meet the liabilities only of creditors of the Company in respect of that segregated account.

16. The Company was initially able to issue four series of shares per Fund: series A, B, C and D. The difference between the series of shares related to the amount of the performance fee and the notice period for redemptions:

(a) Series A and B were fully paid up shares issued to investors. Only A shares were issued in respect of the Aquilo Fund. The difference between the A and B shares related to the amount of the performance fee that could be earned and the notice period for redemptions, but these shares are now indistinguishable given that the Private Fund is in run off (as described in further detail below, at section V.A);

(b) Series C shares were issued only by the Master Fund to the Public Fund. Series C shares had a different performance fee and redemption period; and

4

(c)     Series D shares were issued by the Retro Funds to Investors, on a non-paid up basis, in order to provide on-demand funding to be used to fund reinsurance investments when identified by the Reinsurer.

17.     In respect of the Retro Funds, there are no longer any D shares in issue.  Investors hold either A, B or (in the case of the Public Fund) C shares.

18.     The Company, through its appointed fund administrator, was able to and did issue separate sub-series of each of the A, B, C and D share series.  It issued a separate sub-series to each investor, principally to facilitate tracking of each investors' investment in the Funds.  The rights of holders of different sub-series of shares within each series are the same.

19.     In light of the losses made by the Funds in 2017 and 2018, as described further below at section V.A, there are no performance fees payable on the shares in the Retro Funds, other than in respect of one investor in 2019; and, in light of the fact that the Reinsurer is now in run-off for the purpose of returning capital to investors, the notice periods for redemptions are no longer of any application since all shares have already been redeemed or converted into side-pocket shares (as described below).  Accordingly, there are now no longer any relevant differences between the rights of investors that originally invested in A, B or C shares, save for the reduced management fee of the series C shares held by the Public Fund.

**B.     The Side Pockets**

20.     The Bye-Laws of the Company enable its directors to create 'side-pockets' ("**SPs**", or, in the case of a single side-pocket, an "**SP**") where desirable to do so to manage the liquidity of the Funds.  A SP constitutes a distinct class of shares issued in respect of any particular Fund, holders of which are entitled to share in a defined pool of illiquid assets subject to run-off periods.  The Company utilised SPs at the end of each calendar year to fix the interests of investors in the capital trapped in insurance policies for such year.

(a)     In the Master Fund, SPs were created at the end of each of 2016, 2017, 2018 and 2019.

(b)      In the Aquilo Fund, side pockets were created at the end of each of 2014 through 2020.

21.    During 2019, the Company decided to run-off the Retro Funds and return capital to investors (as described further at section V.A below).  At the end of 2019, all of the assets of the Retro Funds that were not able to be distributed to investors were placed into SP 2019.  The entire issued share capital of both the Aquilo Fund and the Master Fund now comprises SP shares.

## V.    RECENT DEVELOPMENTS

### A.    Losses in 2017 through 2019 and the Decision to Run-Off

22.    While the Master Fund, and therefore the Private Fund operated profitably in other years, in 2017 and 2018, the Master Fund (and, as a consequence, all investors in the Private Fund and the Public Fund) suffered severe losses as a result of the occurrence of a number of unprecedented catastrophic events.  Three hurricanes (Irma, Harvey and Maria) and several wildfires occurred in four different geographic regions.  In 2018, Typhoon Jebi, Hurricanes Michael and Florence, and further California wildfires occurred.  2017 ranks as the record year for catastrophic-risk insured losses since records commenced about a century ago, and 2018 ranks as the fourth-highest year of catastrophic-risk insured losses.  Consequently, investors in the Markel CATCo business suffered material losses on their investments.

23.    Following a second year of losses in 2018, the Manager extended a special redemption option to investors of the Private Fund and, in view of the majority uptake, decided to cease offering new investment in the Funds.  Accordingly, at the end of the 2019 policy year, all remaining capital in the Funds, other than that trapped as collateral for insurance policies, was returned to investors.

24.    On 26 March 2019, investors in the Public Fund voted to approve the orderly run-off of its investments in the Master Fund.  The Public Fund's investment policy is now limited to realising the Public Fund's assets and distributing any net proceeds to the relevant shareholders.

6

650559

25.    On 25 July 2019, the Manager announced that it would cease accepting new investments in the Company and the Funds operated by it, and would not write any new business going forward through the Reinsurer.  The Manager has commenced the orderly run-off of the Reinsurer's existing portfolio, which is expected to take at least three years from January 2020.

26.    The Manager has since continued to manage the retro and reinsurance portfolios, in order to run-off the policies in an orderly manner and, subject to approval from the Bermuda Monetary Authority, return capital to investors as it is released from the trust accounts to the Reinsurer.

**B.    Investor Litigation**

27.    In October 2020, an investor in the Company through the Limited Diversified Arbitrage Fund, Eugenia II Investment Holdings Limited ("**Eugenia**") filed suit against the former chief executive officer of the Manager, Anthony Belisle ("**Belisle**"), in the U.S. District Court for the Middle District of Florida (the "**Florida Court**") alleging fraudulent misrepresentation and negligent misrepresentation for statements made in 2017 related to Eugenia's investment for policy year 2018 (the "**Eugenia Litigation**").  Eugenia sought compensation for losses suffered as a result of its investment in the Retro Funds in 2018, and claimed US$ 7.5 million plus costs and punitive damages.

28.    In January 2021, Belisle, through counsel, filed a motion to dismiss the Eugenia Litigation.

29.    In reliance on an indemnity from the Manager pursuant to the terms of his former employment contract, Belisle demanded that the Manager meet his costs of defending the Eugenia Litigation, and the amount of any judgment, and took steps to have the Manager joined as a defendant to the Litigation although the Manager was not formally joined.

30.    The Eugenia Litigation was settled on a confidential basis without admission of liability by Belisle or the Manager.  Eugenia was paid an amount in settlement of its claims which reflected an assessment of the likelihood of success of the claim and comparatively large legal costs the Manager would be likely to incur in defending the proceeding had it been

7

joined. The Manager claimed the amount of the settlement from its D&O insurance cover, meaning that there was no material depletion of Fund assets.

31.    Following the Eugenia Litigation, another investor in the Markel CATCo business has separately threatened to commence litigation against Belisle and/or the Manager based on similar allegations to those advanced in Eugenia Litigation, however, no such litigation has yet been commenced.

32.    Against the background of the substantial losses suffered by the Funds in both 2017 and 2018, and in light of the Eugenia Litigation and the other, threatened investor litigation, the board of directors of the Company is now concerned that other investors may seek to commence claims against the Manager, Company, Public Fund or Reinsurer, or other persons entitled to indemnities from such entities ("**Investor Claims**").

33.    Although it is impossible to predict every claim an investor might seek to bring, a purely hypothetical example of the type of claim an investor might seek to commence, based on the Eugenia Litigation, would be on the basis of statements or omissions made in the CATCO Group's investor communications and offering materials.

34.    Whilst the Company does not believe these Investor Claims to be valid for various reasons, if investors were to bring Investor Claims, then these claims would all be substantially similar and all investors in the relevant year to which the claims relate would likely have an equivalent claim. Obligations that the CATCo Group and its affiliates have with respect to their operations and professional conduct are common to all investors. If, contrary to the view of the Company, there was any actionable statement or omission in any of the disclosure documents, claims based on such statements would be available to all investors.

## C.    Consequences of Investor Claims

35.    The boards of directors of the CATCo Group companies do not consider that any potential Investor Claims would succeed for a number of reasons. For example, the CATCo Group's offering materials included disclosures around the risk factors that could impact an investment. Marketing materials, including presentations, contained similar disclosures regarding the information provided therein, including the hypothetical nature of the

8

650559

information in those materials.  The disclosures make clear that the model simulations or hypotheticals contained in the presentations should not be relied on as an indication of the characteristics of the actual portfolio.  These are but a few of the examples of the substantial barriers to the Investor Claims.

36.    Furthermore, in 2018 in response to requests from certain U.S. governmental authorities, Markel Corporation engaged Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**") to undertake a thorough review of the loss reserving process for catastrophic events that occurred in 2017 and reserve-related disclosures that the CATCo Group made.  The internal review was completed in April 2019 and Skadden found no evidence that CATCo Group personnel acted in bad faith in exercising their business judgment in the setting of reserves and making related disclosures during late 2017 and early 2018.

37.    Nevertheless, if such further Investor Claims were brought, similar to the Eugenia Litigation, against current or former executive employees of the Manager, it is possible that the Manager would be required, pursuant to indemnities provided under certain of the employment contracts it entered into, to satisfy the likely significant costs of defending such claims and any judgment that was awarded.  Furthermore, in such event, the Manager would likely seek to claim on the indemnities provided in the Management Agreements by the Company, Public Fund and Reinsurer.

38.    The Manager's D&O/E&O insurance cover potentially applicable to these claims is now impaired by approximately thirty-five percent, and there is no other pool of assets available to satisfy further Investor Claims.  Consequently, whilst the settlement of the Eugenia Litigation was funded from insurance proceeds, if further Investor Claims are brought there will not be enough insurance coverage and it may be necessary to satisfy the costs of such claims, and any judgment, from the assets of the Funds.

39.    The costs of defending such Investor Claims could be significant.  The Manager believes that the indemnification costs associated with the Eugenia Litigation would have been several million dollars.  There would have been several million dollars in additional costs borne by the Manager, and through indemnification with the Private Fund and Public Fund, as the Manager responded to various discovery requests in that litigation.  Additionally,

9

costs would multiply if litigation was pursued against more than one defendant (e.g., if a lawsuit were filed against multiple current or former employees or against current or former employees and the Manager).

40.    Further, notwithstanding the boards' view of the likelihood of success of any potential Investor Claims, there is inherently an element of risk in any litigation, particularly in jurisdictions where liability and quantum are determined by jury.

41.    The liability of the Company, Public Fund or Reinsurer for such amounts pursuant to the indemnities would be an unsecured claim, and would be required to be paid prior to any return of capital to investors. Accordingly, any such liabilities would deplete the net asset value of the SPs available to be returned to investors.

42.    The net asset value of each investor's interest in each SP is proportionate to the size of their original investment, and according to the amount of any loss suffered in respect of such year. Accordingly, if a court were to uphold any Investor Claims and award damages by reference to the loss made on the investment, they would likely be for damages in proportion to their holdings in each SP. If, however, some but not all investors were to commence Investor Claims, the pool of available assets could be reduced for the benefit of some but not all investors and the investors that brought such claims could attempt to place themselves in a position to receive recoveries ahead of, and at the expense of, other equity investors in the Markel CATCo business whose rights should rank *pari passu*. This scenario would likely lead to a liquidation of the Companies in order to avoid that inequitable result. Given that all investors in either the Private Fund or Public Fund are invested directly or indirectly in the same business, there is little justification for any investor to be able to 'jump the queue' and obtain an advantage over other investors by way of litigation.

43.    Finally, given the scale of the losses suffered by investors in the Funds in 2017 and 2018 (in excess of US$ 3 billion), if any substantial portion of investors were to assert Investor Claims, the potential liability of the Company, the Public Fund, the Manager or the Reinsurer could easily exceed the remaining net asset value of the Funds, rendering the

10

relevant segregated accounts – or, in the case of the Reinsurer, its general account – insolvent.

**D.    Future Distributions**

44.    Section 15(2)(a) and section 15(7) of the SAC Act apply to the Private Fund. Section 15(2)(a) provides that distributions to holders of shares in segregated accounts, whether by way of dividend or distribution may not be made if "*there are reasonable grounds for believing that [...] the segregated account is not, or would after the payment not be, solvent*".   Section 15(7) of the SAC Act provides that:

> "*A segregated accounts company which is a mutual fund may redeem or repurchase for cancellation shares using the assets linked to the relevant segregated account provided that, on the date of redemption or repurchase, there are reasonable grounds for believing that the relevant segregated account is solvent and would remain so after the redemption or repurchase.*"

45.    Section 54(1)(a) of the Companies Act applies to the Public Fund, and to the general accounts of the Company and the Reinsurer, and states that a company shall not declare or pay a dividend or make a distribution out of contributed surplus, if there are reasonable grounds for believing that the company is, or would after the payment, be unable to pay its liabilities as they become due.

46.    In light of the above statutory provisions, whilst the boards of directors of the Company and the other Companies do not consider that the Investor Claims would succeed, further distribution of Fund assets to investors would require careful consideration of the solvency of the Company or Reinsurer in light of the potential for Investor Claims (the "**Solvency Question**"), given the consequences outlined at section V.C above.

**VI.    PROPOSED RESTRUCTURING**

**A.    The Restructuring Proposal**

47.    Markel Corporation has decided to make a buy-out proposal available to investors in the Company and the Public Fund (the "**Buy-Out Transaction**", and the implementation of

11

the Buy-Out Transaction, the "**Restructuring**"), in order to: (i) prevent any dissipation of Fund assets as a result of Investor Claims; (ii) provide for an early return of capital to investors rateably in proportion to their interests in the SPs, and therefore ensure that all investors are treated alike and none gain an unfair advantage through litigation; and (iii) avoid the potential for Investor Claims and the consequent risk of an insolvent liquidation of the CATCo Group entities.

48.     Under the Buy-Out Transaction, it is intended that both the Company and the Public Fund (each, a "**Scheme Company**", and together, the "**Scheme Companies**") will propose the entry into two creditor schemes of arrangement in Bermuda, under section 99 of the Companies Act (the "**Schemes**").   The Schemes will be conditional upon each other. Further detail in respect of the proposed terms of the Schemes is set out at sub-section C below.

49.     The boards of directors of the Scheme Companies believe that the Schemes would be beneficial to all investors (who are believed to be the only material stakeholders of the Companies), if they are to proceed, in that it will provide for an early return of capital to investors rateably in proportion to their interests in the SPs, and prevent any dissipation of fund assets as a result of Investor Claims.  In particular, the Schemes will avoid the risk of an insolvent liquidation in the event that multiple Investor Claims are brought against the Company, or other entities within the CATCo Group (with resulting indemnity claims against the Company), in the future.  Furthermore, if approved by investors and sanctioned by the Bermuda Court, the Schemes will resolve the Solvency Question, enabling the Reinsurer and Private Fund to continue to run-off the Fund assets in the ordinary course.

50.     The launch of the Schemes is dependent on whether sufficient levels of investor support are obtained.  On or about the time of filing the petition for the winding-up of the Company – which is intended to take place simultaneously with the Public Fund, Reinsurer and Manager filing their own winding-up petitions – and of the application to appointment of the JPLs in respect of the same, the Manager intends to publicly announce the Buy-Out Transaction, with support from the boards of directors of the Companies.  Following the public announcement of the Buy-Out Transaction, investors in both the Company and

12

Public Fund will be given several weeks in which to provide an undertaking to support the Buy-Out Transaction and the relevant Scheme, and in doing so become eligible to receive an early consent fee. During this period, the Companies will engage with investors in the Public Fund and in the Company to obtain their support. The Companies will also consult with the JPLs in relation to the Schemes, before proceeding to launch them.

51.     Based on preliminary discussions held with investors to date, the Companies expect that investors in the Public Fund and the Company are likely to support the Buy-Out Transaction and agree to approve the Schemes. However, if sufficient investors do not agree to support the Schemes, the Company and the Public Fund will need to determine the appropriate course of action, which could include entry into full liquidations (this latter scenario is referred to as the "**Liquidation Scenario**").

52.     As described in detail in the Candiolo Affidavit, whether the scheme process is formally launched or not, the mandatory stay arising from the order appointing the JPLs will protect the CATCo Group entities from the negative impact of potential Investor Claims and therefore to preserve the amount of funds to be returned to investors. This will be especially beneficial during the process of seeking investor support to launch the Schemes, and also during the implementation of the Schemes. In the event that the Schemes are not launched, and the CATCo Group entities decide to commence ordinary, full liquidations, the CATCo Group entities will have the benefit of having provisional liquidators already in place who would be, at that point, already very familiar with the Companies' operations and finances.

53.     For the Court's reference sub-section C below provides a summary overview of the proposed terms of the two Schemes (although it should be noted that these may be subject to change).

**B.     AlixPartners' Analysis**

54.     As part of preparing for the development and proposal of the Schemes, the CATCo Group retained AlixPartners UK LLP ("**AlixPartners**") at the end of May 2021 to prepare a report that analyses the outcomes to investors arising from the Schemes compared to potential scenarios arising in the absence of the Schemes.

13

55.    AlixPartners' report modelled two hypothetical alternative scenarios: (1) a liquidation with very limited unsuccessful loss claims brought by investors; and (2) a liquidation with some loss claims that were successful.  In each case, there were a number of downside factors that could impact investor returns whether or not the claims were successful, including: (i) the costs of the liquidation process; (ii) the legal fees associated with adjudicating any claims; and (iii) the increased creditor pool arising from any admitted claims.  The report found that the outcomes for each scenario were materially worse for investors than under the Schemes.

56.    Further detail in respect of AlixPartners work, carried out on behalf of the CATCo Group prior to Simon Appell's appointment as one of the JPLs, is set out in the Candiolo Affidavit.

## C.    The Buy-Out Transaction and the Schemes

57.    The Schemes will seek to implement a cash buy-out of all or substantially all of the investors' shares in the Retro Funds, and an early return of value to investors in the Aquilo Fund.  Markel Corporation will provide funding to the Private Fund to allow an early return of capital to investors.   In consideration for the return of capital, the investors, the Companies, Markel Corporation and each of their related parties will provide mutual releases pursuant to which they will release each other from any and all claims of whatever nature arising out of the Companies' businesses and/or the investors' shares (the "**Releases**").

58.    If approved by investors and sanctioned by the Court, the Schemes will resolve the Solvency Question described above, enabling the CATCo Group to make further distributions to investors and continue to run-off the remaining Fund assets in the ordinary course.

### 1.    Distribution to investors in the Retro Funds

59.    Certain wholly-owned subsidiaries of Markel Corporation (the "**Funding Cos**"), will provide funds (the "**Buy-Out Amount**") to the Private Fund to enable it to distribute to investors in the Retro Fund (including the Public Fund) on or shortly after the closing date (the "**Closing Date**"), each investor's proportional entitlement to:

14

     (a)     100% of the Closing NAV of the 2016 Master Fund SP;

     (b)     100% of the Closing NAV of the 2017 Master Fund SP;

     (c)     90% of the Closing NAV of the 2018 Master Fund SP; and

     (d)     80% of the Closing NAV of the 2019 Master Fund SP

     (together, the "**Retro Fund Accelerated Distribution**").

60.    'Closing NAV' represents current NAV adjusted for costs of the Buy-Out Transaction and a reserve for the estimated operating and other fees to run-off the Funds.

61.    In addition to the Retro Fund Accelerated Distribution, investors in the 2018 Master Fund SP and 2019 Master Fund SP will also remain entitled to their remaining portion of Closing NAV, and all investors will remain entitled to receive any upside, should NAV increase, after the return of the Buy-Out Amount to the Funding Cos.

62.    The Retro Fund Accelerated Distributions will be funded from a combination of (i) the amount of assets available for distribution to investors in a particular SP on the Closing Date as determined by the Manager in accordance with past practice, relevant bye-laws and supplemental offering memorandum, (ii) cash on hand at the relevant Retro Fund and (iii) the Buy-Out Amount to be provided by the Funding Cos.

63.    The Buy-Out Amount shall be advanced by the Funding Cos to a wholly-owned subsidiary (the "**Purchaser**") of Markel Corporation.  The Purchaser shall acquire shares in the Reinsurer from the Master Fund and the Master Fund will then use the Buy-Out Amount to make the Retro Fund Accelerated Distributions.

### 2.    *Distributions to investors in the Aquilo Fund*

64.    For the Aquilo Fund, a substantial portion of the Fund assets are currently held by a rated fronting reinsurer (the "**Fronting Reinsurer**") as protection against any reserve strengthening required on certain policies.  In order to facilitate an early release of such capital, a wholly-owned subsidiary of Markel Corporation will provide an adverse development cover to the Fronting Reinsurer that will enable the release of $100 million

15

to the Private Fund, which will be returned to investors in the Aquilo Fund less an allocation of the costs of the Buy-Out Transaction and a reserve on account of the likely costs to run-off the remainder of the Aquilo Fund assets.

### 3.    *Distributions to investors in the Public Fund*

65.    The Public Fund is an investor in the Master Fund, and will receive its Retro Fund Accelerated Distribution in accordance with the Private Fund Scheme.   The Public Fund has issued two classes of shares: Ordinary Shares and C Shares.  Further detail in respect of the shareholding structure in the Public Fund is set out in the Candiolo Affidavit.

66.    The amounts received by the Public Fund will be distributed to holders of Ordinary Shares and C Shares in accordance with their proportionate entitlements and in accordance with the Public Fund Bye-Laws.

### 4.    *The Releases*

67.    The Schemes will provide that investors, the Companies, Markel Corporation and their related parties and affiliates grant the Releases.  Pursuant to the Schemes all investors will release any potential Investor Claims against the Reinsurer, the Scheme Companies, the JPLs, the Manager, Markel Corporation, the advisors to the Companies and the JPLs, and the various other parties entitled to an indemnity under the Management Agreements.

## VII.    RESOLUTION TO COMMENCE WINDING-UP PROCEEDINGS

68.    The directors of the Company have the power under the bye-laws of the Company to *"present any petition and make any application in connection with the liquidation or reorganisation of* [the] *Company"*.

69.    In order to facilitate the implementation of the Restructuring, between 9 to 17 September 2021, the boards of directors of each of the Company, the Public Fund, the Reinsurer and the Manager, pursuant to their powers under the respective bye-laws, unanimously approved a written resolution to:

(a)    commence winding-up proceedings by the presentation of a petition to the Supreme Court under the provisions of the Companies Act, section 161(a); and

(a)     seek the appointment of Simon Appell of AlixPartners UK LLP and John C. McKenna of Finance & Risk Services Ltd. as joint provisional liquidators (the "**JPLs**") to monitor the implementation of the Schemes, with, in the first instance, powers of oversight, leaving the existing boards of directors of each of the Companies responsible for the Restructuring.

70.     The Manager, as the sole voting shareholder of the Company, has also passed a written resolution to wind the Company up under section 161(a) of the Companies Act.

71.     It is anticipated that on the first return date of this Petition an application will be made for an adjournment to allow time for the Companies to obtain investor support for the launch of the Schemes and the Restructuring.  In the event that the requisite levels of investor support are _not_ obtained, and the board of directors of the Company (the "**Board**") determines not to proceed with the launch of the Scheme, it is anticipated that the Board will then determine whether the Company should enter into full liquidation and therefore seek to continue with the Petition.

72.     The terms of the orders sought for the appointment of the JPLs provide for, _inter alia_, the continuation of the current management of the Companies during this process, with the JPLs monitoring the activities of the existing boards of directors of each the Company, Public Fund, Manager and Reinsurer entities in promoting the Restructuring and the Schemes and, in that capacity, reporting to this Court if it appears that the Restructuring may be no longer in the interests of creditors and investors (in which case, the Companies may proceed to enter into the Liquidation Scenario).

**YOUR PETITIONER THEREFORE HUMBLY PRAYS AS FOLLOWS:**

1.     That the Company be wound up by order of the Court under the provisions of the Companies Act and the SAC Act;

2.     That Simon Appell of AlixPartners UK LLP and John C. McKenna of Finance & Risk Services Ltd. be appointed as joint provisional liquidators of the Company;

3.     That such other order may be made in the premises as shall be just; and

17

4.    That the costs of and occasioned by this Petition be paid out of the assets of the Company.

Dated this 27th day of September 2021

ASW LAW LIMITED
Crawford House
50 Cedar Avenue
Hamilton HM 11
Attorneys for the Petitioner

**NOTE:** It is intended to serve this petition on the Registrar of Companies and the Bermuda Monetary Authority.

It is ordered that this Petition shall be heard before the court sitting on the        day of        at        o'clock in the        -noon.

Dated this        day of        2021

REGISTRAR

650559

IN THE SUPREME COURT OF BERMUDA
COMMERCIAL COURT
COMPANIES (WINDING UP)
2021: No.

IN THE MATTER OF MARKEL CATCO REINSURANCE
FUND LTD.
AND IN THE MATTER OF THE COMPANIES ACT 1981
AND IN THE MATTER OF THE SEGREGATED
ACCOUNTS COMPANIES ACT 2000

---

## PETITION

---





**ASW Law Limited | Crawford House**
50 Cedar Avenue | Hamilton, HM11
BERMUDA

Attorneys to the Petitioner

KALG/7363-005



**EXHIBIT A-2**

**Winding-Up Petition of CATCo Reinsurance Opportunities Fund Ltd.**

IN THE SUPREME COURT OF BERMUDA
COMMERCIAL COURT
COMPANIES (WINDING UP)
2021: No.

IN THE MATTER OF CATCO REINSURANCE OPPORTUNITIES FUND LTD.
AND IN THE MATTER OF THE COMPANIES ACT 1981

---

## PETITION

---

**THE HUMBLE PETITION** of CATCo Reinsurance Opportunities Fund Ltd. (the "**Company**" or the "**Petitioner**") showeth as follows:

## I.       INTRODUCTION

1.       The Company was incorporated with limited liability under the Companies Act 1981, as amended (the "**Companies Act**"), on 30 November 2010 as an exempted company, with registered number 44855.

2.       The registered office of the Company is at Crawford House, 50 Cedar Avenue, Hamilton HM11, Bermuda.

3.       The authorised share capital of the Company is US$ 74,019,867.40 divided into 149,305,187 ordinary shares of par value US$ 0.00013716 each and 83,230,467 C shares of par value US$ 0.0001 each.

4.       The Company is publicly listed on the London Stock Exchange and the Bermuda Stock Exchange. All of the ordinary and C shares issued by the Company are admitted to trading on the Specialist Fund Segment of the London Stock Exchange and also on the Bermuda Stock Exchange.

5.       The Company's objects and powers are unrestricted.

## II.      BACKGROUND TO THE COMPANY AND ITS OPERATION

6.       The Company was incorporated for the purpose of, among other things, carrying on the business of a mutual fund within the meaning of section 156A of the Companies Act.

650560                                                                                                    1

7.     In 2015, Markel Corporation, an entity incorporated in the Commonwealth of Virginia, United States of America ("**Markel Corporation**"), acquired the insurance linked securities business operated by CATCo Investment Management Limited, a Bermuda incorporated company.   As a result of this acquisition, Markel CATCo Investment Management Ltd. (the "**Manager**") was incorporated on 2 September 2015 in order to take over the role of CATCo Investment Management Limited and to manage the investments of the Company and the Private Fund (as described below).   Within this structure, the Company is referred to as the "**Public Fund**".   References in this Petition to the 'Public Fund' are to the Company.

8.     From 2015 to 2019, the Manager managed a reinsurance and retrocessional reinsurance business (the "**Markel CATCo business**").   Under the Markel CATCo business capital was raised by soliciting investments through a fund structure operated by the Public Fund and Markel CATCo Reinsurance Fund Limited (the "**Private Fund**"), a mutual fund company which is registered as a segregated account company under the Segregated Accounts Companies Act 2000, as amended (the "**SAC Act**"). In accordance with the CATCo Group's (as defined below) offering documents, such investor capital was ultimately invested in Markel CATCo Re Limited (the "**Reinsurer**"), by way of the segregated accounts operated by the Private Fund subscribing for shares in the Reinsurer. Each class of shares issued by the Reinsurer was linked to specific reinsurance products, as described further below.

9.     The Company, Manager, Private Fund and Reinsurer are referred to collectively as the "**CATCo Group**" or the "**Companies**".   Further detail in respect of each of the Companies, including a simplified structure chart illustrating the current corporate and fund structure of the CATCo Group, is set out in the first affidavit of Federico Alejandro Candiolo dated 27 September 2021, filed in support of this winding-up petition (the "**Candiolo Affidavit**").

10.    The Reinsurer is registered with the BMA as a Class 3 Insurer under the Insurance Act 1978.   As part of the Markel CATCo business, the Reinsurer provided catastrophic risk reinsurance and retrocessional ("**retro**") reinsurance to its clients, covering extraordinary

2

losses incurred in respect of certain regions and certain natural disasters within a defined time period, usually a calendar year.  The Reinsurer was funded by investor capital raised directly by the Private Fund, and raised indirectly by the Public Fund on the Specialist Fund Segment of the London Stock Exchange (with secondary listing on the Bermuda Stock Exchange), pursuant to the investment structure described in outline at paragraph 11 below.  The reinsurance policies issued by the Reinsurer were, and those that remain subject to the reinsurance run-off process are, fully collateralised, meaning that the Reinsurer held and continues to hold cash and cash equivalent assets in a separate trust account for each reinsurance contract equivalent to the full potential liability under the contract.  The collateral comprised the premium paid by the reinsurance clients, plus an allocation of the proceeds of investments from the Private Fund and, indirectly, the Public Fund.

11.     In respect of the structure of investments in the Markel CATCo business, in summary, private investors would invest directly through the Private Fund and public and institutional investors invested in the Public Fund, which in turn invested directly in the Private Fund. In essence, therefore, the Public Fund operated as a "feeder fund" through which public and institutional investors were able to invest indirectly in the Master Fund, a segregated account, of the Private Fund (as described at paragraph 13 below).

12.     The Manager entered into management agreements with each of the Private Fund, the Public Fund and the Reinsurer (the "**Management Agreements**") under which the Private Fund, the Public Fund and the Reinsurer provided broad indemnities to the Manager and its affiliates and others in respect of claims arising out of the Manager's performance of its duties under the Management Agreements, other than claims for negligence, gross or wilful negligence, wilful default, fraud and dishonesty (depending on the particular wording used in each Management Agreement).  Further detail in respect of the Management Agreements is set out in the Candiolo Affidavit.

**A.     Fund Structure operated by the Private Fund**

13.     The Private Fund operates eight funds, namely: (i) Master Fund; (ii) Diversified Fund II; (iii) Limited Diversified Arbitrage Fund; (iv) Diversified Arbitrage Fund; (v) GTL

Diversified Fund; (vi) Markel Diversified Fund; (vii) QIC Diversified Fund; and (viii) Aquilo Fund (collectively, the "**Funds**", and each, a "**Fund**"). The Funds are segregated accounts of the Private Fund, meaning that each Fund is a separate individually managed pool of assets with its own investment objective and policies.

14.     Excluding the Aquilo Fund, the other seven Funds are connected, with each of (i) Diversified Fund II; (ii) Limited Diversified Arbitrage Fund; (iii) Diversified Arbitrage Fund; (iv) GTL Diversified Fund; (v) Markel Diversified Fund; and (vi) QIC Diversified Fund, in that each of (ii) through (vii) holds investments in the Master Fund. These six Funds, plus the Master Fund, are collectively referred to as the "**Retro Funds**".

15.     The funds and investments operated by the Private Fund can be broadly divided into two categories: (i) the investments in, and investments made by, the Aquilo Fund; and (ii) the investments in, and investments made by, the Retro Funds.

**B.     The Company's investments in the Master Fund of the Private Fund**

16.     As noted at paragraph 11 above, the Company operates as a "feeder fund" through which public and institutional investors can invest indirectly in the Master Fund of the Private Fund. With the funds the Company raised from the sale of shares to such investors, the Company invested in shares issued by the Master Fund of the Private Fund.

17.     By way of background, the Private Fund has created 'side-pockets' ("**SPs**", or, in the case of a single side-pocket, an "**SP**") to manage the liquidity of the Funds it operates. A SP constitutes a distinct class of shares issued in respect of any particular Fund, holders of which are entitled to share in a defined pool of illiquid assets subject to run-off periods. The Private Fund utilised SPs at the end of each calendar year to fix the interests of investors in the capital trapped in insurance policies for such year.

18.     In the Master Fund, SPs were created at the end of each of 2016, 2017, 2018 and 2019. All of the Company's shares in the Master Fund have now been converted to SP shares for the relevant years. Therefore, each of the investors in the Company is entitled to their share of the relevant Master Fund SP.

C.    **Share Rights in the Company**

19.    The Company has issued two classes of shares: ordinary shares ("**Ordinary Shares**") and C shares ("**C Shares**") (together, the "**Shares**"), the proceeds of which were used to subscribe for shares in the Master Fund. The Ordinary Shares and the C Shares carry the same right to receive notice of, and to attend or vote at, any general meeting of the Public Fund (notwithstanding any difference in the respective net asset value of the Ordinary Shares and the C Shares). The differences between the Ordinary Shares and C Shares relate to the policy years in the retro reinsurance business in which they are invested. The Ordinary Shares are invested in policy years 2016 through to 2019, and the C Shares are invested in policy years 2018 and 2019.

20.    As noted above, all of the shares issued by the Private Fund have now been converted to SPs. Accordingly, holders of Ordinary Shares ("**Ordinary Members**") and holders of C Shares ("**C Members**") now hold interests in the following SPs:

    (a)    Ordinary Members are indirect holders of investments in: (i) 2016 Master Fund SP; (ii) 2017 Master Fund SP; (iii) 2018 Master Fund SP; and (iv) 2019 Master Fund SP; and

    (b)    C Members are indirect holders of investments in: (i) 2018 Master Fund SP; and (ii) 2019 Master Fund SP.

21.    The Ordinary and C Shares in the Public Fund are either listed or certificated and admitted to trading on the Specialist Fund Segment of the London Stock Exchange. The Public Fund's Shares are also listed on the Bermuda Stock Exchange.

22.    Other than a small percentage of shares which are held in certificated form by certain investors, the majority of the Shares in the Company are held by Link Market Services Trustees (Nominees) Limited (formerly known as Capita IRG Trustees Ltd) ("**Link**"), as depository for the purpose of the listing of the Shares on the London Stock Exchange.

23.    Link has issued depository interests ("**DIs**") in respect of the Shares it holds legal title to, that are in turn held by "**Holders**", which broadly comprise of various account banks,

5

through the CREST system.  The relationship between the Holders and Link is set out in the Deed Poll entered into by Link dated 10 December 2010 ("**Depository Deed**"), exhibited to the Candiolo Affidavit.  In summary, and as explained in the Candiolo Affidavit, Link holds, subject to the terms and requirements of the Depository Deed, the DIs on behalf of the ultimate beneficial owners ("**UBOs**") that purchase them through trading on the exchange.

## III.   RECENT DEVELOPMENTS

### A.   Losses in 2017 through 2019 and the Decision to Run-Off

24.   While the Master Fund, and therefore the Private Fund operated profitably in other years, in 2017 and 2018, the Master Fund (and, as a consequence, all investors in the Private Fund and the Public Fund) suffered severe losses as a result of the occurrence of a number of unprecedented catastrophic events.  Three hurricanes (Irma, Harvey and Maria) and several wildfires occurred in four different geographic regions.  In 2018, Typhoon Jebi, Hurricanes Michael and Florence, and further California wildfires occurred.  2017 ranks as the record year for catastrophic-risk insured losses since records commenced about a century ago, and 2018 ranks as the fourth-highest year of catastrophic-risk insured losses.  Consequently, investors in the Markel CATCo business suffered material losses on their investments.

25.   Following a second year of losses in 2018, the Manager extended a special redemption option to investors of the Private Fund and, in view of the majority uptake, decided to cease offering new investment in the Funds.  Accordingly, at the end of the 2019 policy year, all remaining capital in the Funds, other than that trapped as collateral for insurance policies, was returned to investors.

26.   On 26 March 2019, investors in the Public Fund voted to approve the orderly run-off of its investments in the Master Fund.  The Public Fund's investment policy is now limited to realising the Public Fund's assets and distributing any net proceeds to the relevant shareholders.

27.   On 25 July 2019, the Manager announced that it would cease accepting new investments in the Company and the Funds operated by it, and would not write any new business going

6

forward through the Reinsurer. The Manager has commenced the orderly run-off of the Reinsurer's existing portfolio, which is expected to take at least three years from January 2020.

28.    The Manager has since continued to manage the retro and reinsurance portfolios, in order to run-off the policies in an orderly manner and, subject to approval from the Bermuda Monetary Authority, return capital to investors as it is released from the trust accounts to the Reinsurer.

**B.    Investor Litigation**

29.    In October 2020, an investor in the Private Fund through the Limited Diversified Arbitrage Fund, Eugenia II Investment Holdings Limited ("**Eugenia**") filed suit against the former chief executive officer of the Manager, Anthony Belisle ("**Belisle**"), in the U.S. District Court for the Middle District of Florida (the "**Florida Court**") alleging fraudulent misrepresentation and negligent misrepresentation for statements made in 2017 related to Eugenia's investment for policy year 2018 (the "**Eugenia Litigation**"). Eugenia sought compensation for losses suffered as a result of its investment in the Retro Funds in 2018, and claimed US$ 7.5 million plus costs and punitive damages.

30.    In January 2021, Belisle, through counsel, filed a motion to dismiss the Eugenia Litigation.

31.    In reliance on an indemnity from the Manager pursuant to the terms of his former employment contract, Belisle demanded that the Manager meet his costs of defending the Eugenia Litigation, and the amount of any judgment, and took steps to have the Manager joined as a defendant to the Litigation although the Manager was not formally joined.

32.    The Eugenia Litigation was settled on a confidential basis without admission of liability by Belisle or the Manager. Eugenia was paid an amount in settlement of its claims which reflected an assessment of the likelihood of success of the claim and comparatively large legal costs the Manager would be likely to incur in defending the proceeding had it been joined. The Manager claimed the amount of the settlement from its D&O insurance cover, meaning that there was no material depletion of Fund assets.

7

33.     Following the Eugenia Litigation, another investor in the Markel CATCo business has separately threatened to commence litigation against Belisle and/or the Manager based on similar allegations to those advanced in Eugenia Litigation, however, no such litigation has yet been commenced.

34.     Against the background of the substantial losses suffered by the Funds in both 2017 and 2018, and in light of the Eugenia Litigation and the other, threatened investor litigation, the board of directors of the Company is now concerned that other investors may seek to commence claims against the Manager, Company, Private Fund or Reinsurer, or other persons entitled to indemnities from such entities ("**Investor Claims**").

35.     Although it is impossible to predict every claim an investor might seek to bring, a purely hypothetical example of the type of claim an investor might seek to commence, based on the Eugenia Litigation, would be on the basis of statements or omissions made in the CATCO Group's investor communications and offering materials.

36.     Whilst the Company does not believe these Investor Claims to be valid for various reasons, if investors were to bring Investor Claims, then these claims would all be substantially similar and all investors in the relevant year to which the claims relate would likely have an equivalent claim. Obligations that the CATCo Group and its affiliates have with respect to their operations and professional conduct are common to all investors. If contrary to the view of the Company, there was any actionable statement or omission in any of the disclosure documents, claims based on such statements would be available to all investors.

## C.    Consequences of Investor Claims

37.     The boards of directors of the CATCo Group companies do not consider that any potential Investor Claims would succeed for a number of reasons. For example, the CATCo Group's offering materials included disclosures around the risk factors that could impact an investment. Marketing materials, including presentations, contained similar disclosures regarding the information provided therein, including the hypothetical nature of the information in those materials. The disclosures make clear that the model simulations or hypotheticals contained in the presentations should not be relied on as an indication of the

characteristics of the actual portfolio. These are but a few of the examples of the substantial barriers to the Investor Claims.

38. Furthermore, in 2018 in response to requests from certain U.S. governmental authorities, Markel Corporation engaged Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**") to undertake a thorough review of the loss reserving process for catastrophic events that occurred in 2017 and reserve-related disclosures that the CATCo Group made. The internal review was completed in April 2019 and Skadden found no evidence that CATCo Group personnel acted in bad faith in exercising their business judgment in the setting of reserves and making related disclosures during late 2017 and early 2018.

39. Nevertheless, if such further Investor Claims were brought, similar to the Eugenia Litigation, against current or former executive employees of the Manager, it is possible that the Manager would be required, pursuant to indemnities provided under certain of the employment contracts it entered into, to satisfy the likely significant costs of defending such claims and any judgment that was awarded. Furthermore, in such event, the Manager would likely seek to claim on the indemnities provided in the Management Agreements by the Company, Private Fund and Reinsurer.

40. The Manager's D&O/E&O insurance cover potentially applicable to these claims is now impaired by approximately thirty-five percent, and there is no other pool of assets available to satisfy further Investor Claims. Consequently, whilst the settlement of the Eugenia Litigation was funded from insurance proceeds, if further Investor Claims are brought there will not be enough insurance coverage and it may be necessary to satisfy the costs of such claims, and any judgment, from the assets of the Funds.

41. The costs of defending such Investor Claims could be significant. The Manager believes that the indemnification costs associated with the Eugenia Litigation would have been several million dollars. There would have been several million dollars in additional costs borne by the Manager, and through indemnification with the Company and the Private Fund, as the Manager responded to various discovery requests in that litigation. Additionally, costs would multiply if litigation was pursued against more than one

defendant (e.g., if a lawsuit were filed against multiple current or former employees or against current or former employees and the Manager).

42.    Further, notwithstanding the boards' view of the likelihood of success of any potential Investor Claims, there is inherently an element of risk in any litigation, particularly in jurisdictions where liability and quantum are determined by jury.

43.    The liability of the Company, Private Fund or Reinsurer for such amounts pursuant to the indemnities would be an unsecured claim and would be required to be paid prior to any return of capital to investors.  Accordingly, any such liabilities would deplete the net asset value of the SPs available to be returned to investors.

44.    The net asset value of each investor's interest in each SP is proportionate to the size of their original investment, and according to the amount of any loss suffered in respect of such year.  Accordingly, if a court were to uphold any Investor Claims and award damages by reference to the loss made on the investment, they would likely be for damages in proportion to their holdings in each SP.  If, however, some but not all investors were to commence Investor Claims, the pool of available assets could be reduced for the benefit of some but not all investors and the investors that brought such claims could attempt to place themselves in a position to receive recoveries ahead of, and at the expense of, other equity investors in the Markel CATCo business whose rights should rank *pari passu*.  This scenario would likely lead to a liquidation of the Companies in order to avoid that inequitable result.  Given that all investors in either the Private Fund or Public Fund are invested directly or indirectly in the same business, there is little justification for any investor to be able to 'jump the queue' and obtain an advantage over other investors by way of litigation.

45.    Finally, given the scale of the losses suffered by investors in the Funds in 2017 and 2018 (in excess of US$ 3 billion), if any substantial portion of investors were to assert Investor Claims, the potential liability of the Company, the Private Fund, the Manager or the Reinsurer could easily exceed the remaining net asset value of the Funds, rendering the relevant segregated accounts – or, in the case of the Reinsurer, its general account – insolvent.

10

### D.    Future Distributions

46.    Section 15(2)(a) of the SAC Act (which is applicable to the Reinsurer and the Private Fund) provides that distributions to holders of shares in segregated accounts, whether by way of dividend or distribution may not be made if *"there are reasonable grounds for believing that [...] the segregated account is not, or would after the payment not be, solvent"*.

47.    Section 54(1)(a) of the Companies Act, applies to the Company, and to the general accounts of the Private Fund and the Reinsurer, and states that a company shall not declare or pay a dividend or make a distribution out of contributed surplus, if there are reasonable grounds for believing that the company is, or would after the payment, be unable to pay its liabilities as they become due.

48.    In light of the above statutory provisions, whilst the boards of directors of the Company and the other Companies do not consider that the Investor Claims would succeed, further distribution of Fund assets to investors would require careful consideration of the solvency of the Private Fund or Reinsurer in light of the potential for Investor Claims (the "**Solvency Question**"), given the consequences outlined at section III.D above.

## IV.    PROPOSED RESTRUCTURING

### A.    The Restructuring Proposal

49.    Markel Corporation has decided to make a buy-out proposal available to investors in the Company and the Private Fund (the "**Buy-Out Transaction**", and the implementation of the Buy-Out Transaction, the "**Restructuring**"),  in order to: (i) prevent any dissipation of Fund assets as a result of Investor Claims; (ii) provide for an early return of capital to investors rateably in proportion to their interests in the SPs, and therefore ensure that all investors are treated alike and none gain an unfair advantage through litigation; and (iii) avoid the potential for Investor Claims and the consequent risk of an insolvent liquidation of the CATCo Group entities.

50.    Under the Buy-Out Transaction, it is intended that both the Company and the Private Fund (each, a "**Scheme Company**", and together, the "**Scheme Companies**") will propose the entry into two creditor schemes of arrangement in Bermuda, under section 99 of the

Companies Act (the "**Schemes**").  The Schemes will be conditional upon each other. Further detail in respect of the proposed terms of the Schemes is set out at sub-section C below.

51.    The boards of directors of the Scheme Companies believe that the Schemes would be beneficial to all investors (who are believed to be the only material stakeholders of the Companies), if they are to proceed, in that it will provide for an early return of capital to investors rateably in proportion to their interests in the SPs, and prevent any dissipation of fund assets as a result of Investor Claims.  In particular, the Schemes will avoid the risk of an insolvent liquidation in the event that multiple Investor Claims are brought against the Company, or other entities within the CATCo Group (with resulting indemnity claims against the Company), in the future.  Furthermore, if approved by investors and sanctioned by the Bermuda Court, the Schemes will resolve the Solvency Question, enabling the Reinsurer and Private Fund to continue to run-off the Fund assets in the ordinary course.

52.    The launch of the Schemes is dependent on whether sufficient levels of investor support are obtained. On or about the time of filing the petition for the winding-up of the Company – which is intended to take place simultaneously with the Private Fund, Reinsurer and Manager filing their own winding-up petitions – and of the application to appointment of the JPLs in respect of the same, the Manager intends to publicly announce the Buy-Out Transaction, with support from the boards of directors of the Companies.  Following the public announcement, investors in both the Company and Private Fund will be given several weeks in which to provide an undertaking to support the Buy-Out Transaction and relevant Scheme, and in doing so become eligible to receive an early consent fee.  During this period, the Companies will engage with investors in the Private Fund and in the Company to obtain their support. The Companies will also consult with the JPLs in relation to the Schemes, before proceeding to launch them.

53.    Based on preliminary discussions held with investors to date, the Companies expect that investors in the Company and the Private Fund are likely to support the Buy-Out Transaction and agree to approve the Schemes.  However, if sufficient investors do not agree to support the Schemes, the Company and the Public Fund will need to determine

the appropriate course of action, which could include entry into full liquidations (this latter scenario is referred to as the "**Liquidation Scenario**").

54.    As described in detail in the Candiolo Affidavit, whether the scheme process is formally launched or not, the winding-up proceedings are intended to protect the CATCo Group entities from the negative impact of potential Investor Claims and therefore to preserve the amount of funds to be returned to investors. This will be especially beneficial during the process of seeking investor support to launch the Schemes, and also during the implementation of the Schemes. In the event that the Schemes are <u>not</u> launched, and the CATCo Group entities decide to commence ordinary, full liquidations, the CATCo Group entities will have the benefit of having provisional liquidators already in place who would be, at that point, already very familiar with the Companies' operations and finances.

55.    For the Court's reference, sub-section C below provides a summary overview of the proposed terms of the two Schemes (although it should be noted that these may be subject to change).

**B.    AlixPartners' Analysis**

56.    As part of preparing for the development and proposal of the Schemes, the CATCo Group retained AlixPartners UK LLP ("**AlixPartners**") at the end of May 2021 to prepare a report that analyses the outcomes to investors arising from the Schemes compared to potential scenarios arising in the absence of the Schemes.

57.    AlixPartners' report modelled two hypothetical alternative scenarios. (1) a liquidation with very limited unsuccessful loss claims brought by investors; and (2) a liquidation with some loss claims that were successful. In each case, there were a number of downside factors that could impact investor returns whether or not the claims were successful, including: (i) the costs of the liquidation process; (ii) the legal fees associated with adjudicating any claims; and (iii) the increased creditor pool arising from any admitted claims. The report found that the outcomes for each scenario were materially worse for investors than under the Schemes.

650560

58.     Further detail in respect of AlixPartners work, carried out on behalf of the CATCo Group
        prior to Simon Appell's appointment as one of the JPLs, is set out in the Candiolo Affidavit.

**C.      The Buy-Out Transaction and the Schemes**

59.     The Schemes will seek to implement a cash buy-out of all or substantially all of the
        investors' shares in the Retro Funds, and an early return of value to investors in the Aquilo
        Fund.  Affiliates of Markel Corporation will provide funding to the Private Fund to allow
        an early return of capital to investors.  In consideration for the return of capital, the
        investors, the Companies, Markel Corporation and each of their related parties will provide
        mutual releases pursuant to which they will release each other from any and all claims of
        whatever nature arising out of the Companies' businesses and/or the investors' shares (the
        "**Releases**").

60.     If approved by investors and sanctioned by the Court, the Schemes will resolve the
        Solvency Question described above, enabling the CATCo Group to make further
        distributions to investors and continue to run-off the remaining Fund assets in the ordinary
        course.

**1.      *Distribution to investors in the Retro Funds***

61.     Certain wholly-owned subsidiaries of Markel Corporation (the "**Funding Cos**"), will
        provide funds (the "**Buy-Out Amount**") to the Private Fund to enable it to distribute to
        investors in the Retro Fund (including the Public Fund) on or shortly after the closing date
        (the "**Closing Date**"), each investor's proportional entitlement to:

        (a)      100% of the Closing NAV of the 2016 Master Fund SP;

        (b)      100% of the Closing NAV of the 2017 Master Fund SP;

        (c)      90% of the Closing NAV of the 2018 Master Fund SP; and

        (d)      80% of the Closing NAV of the 2019 Master Fund SP,

                 (together, the "**Retro Fund Accelerated Distribution**").

14

62.     'Closing NAV' represents current NAV adjusted for costs of the Buy-Out Transaction and a reserve for the estimated operating and other fees to run-off the Funds.

63.     In addition to the Retro Fund Accelerated Distribution, investors in the 2018 Master Fund SP and 2019 Master Fund SP will also remain entitled to their remaining portion of Closing NAV, and all investors will remain entitled to receive any upside, should NAV increase, after the return of the Buy-Out Amount to the Funding Cos.

64.     The Retro Fund Accelerated Distributions will be funded from a combination of (i) the amount of assets available for distribution to investors in a particular SP on the Closing Date as determined by the Manager in accordance with past practice, relevant bye-laws and supplemental offering memorandum, (ii) cash on hand at the relevant Retro Fund and (iii) the Buy-Out Amount to be provided by the Funding Cos.

65.     The Buy-Out Amount shall be advanced by the Funding Cos to a wholly-owned subsidiary (the "**Purchaser**") of Markel Corporation.  The Purchaser shall acquire shares in the Reinsurer from the Master Fund and the Master Fund will then use the Buy-Out Amount to make the Retro Fund Accelerated Distributions.

### 2.     *Distributions to investors in the Aquilo Fund*

66.     For the Aquilo Fund, a substantial portion of the Fund assets are currently held by a rated fronting reinsurer (the "**Fronting Reinsurer**") as protection against any reserve strengthening required on certain policies.  In order to facilitate an early release of such capital, a wholly-owned subsidiary of Markel Corporation will provide an adverse development cover to the Fronting Reinsurer that will enable the release of $100 million to the Private Fund, which will be returned to investors in the Aquilo Fund less an allocation of the costs of the Buy-Out Transaction and a reserve on account of the likely costs to run-off the remainder of the Aquilo Fund assets.

### 3.     *Distributions to investors in the Public Fund*

67.     The Public Fund is an investor in the Master Fund, and will receive its Retro Fund Accelerated Distribution in accordance with the Private Fund Scheme.  The Public Fund

15

650560

has issued two classes of shares: Ordinary Shares and C Shares. Further detail in respect of the shareholding structure in the Public Fund is set out in the Candiolo Affidavit.

68. The amounts received by the Public Fund will be distributed to holders of Ordinary Shares and C Shares in accordance with their proportionate entitlements and in accordance with the Public Fund Bye-Laws.

### 4.    *The Releases*

69. The Schemes will provide that investors, the Companies, Markel Corporation and their related parties and affiliates grant the Releases. Pursuant to the Schemes all investors will release any potential Investor Claims against the Reinsurer, the Scheme Companies, the JPLs, the Manager, Markel Corporation, the advisors to the Companies and the JPLs and the various other parties entitled to an indemnity under the Management Agreements.

## V.    RESOLUTION TO COMMENCE WINDING-UP PROCEEDINGS

70. The directors of the Company have the power under the Company's bye-laws to "*present any petition and make any application in connection with the liquidation or reorganisation of* [the] *Company*".

71. In order to facilitate the implementation of the Restructuring, between 9 to 17 September 2021, the boards of directors of each of the Company, the Private Fund, the Reinsurer and the Manager, pursuant to their powers under the respective bye-laws, unanimously approved a written resolution to:

(a)    commence winding-up proceedings by the presentation of a petition to the Supreme Court under the provisions of the Companies Act, section 161(a); and

(b)    seek the appointment of Simon Appell of AlixPartners UK LLP and John C. McKenna of Finance & Risk Services Ltd. as joint provisional liquidators (the "**JPLs**") to monitor the implementation of the Schemes, with, in the first instance, powers of oversight, leaving the existing boards of directors of each of the Companies responsible for the Restructuring.

72.    The board of directors of the Company (the "**Board**") is relying on its power under the Company's Bye-Laws to "*present any petition and make any application in connection with the liquidation or reorganisation of* [the] *Company*", rather than convening a shareholder general meeting to pass a shareholder resolution to wind the Company up.  In any event, as noted above, investors in the Company will have an opportunity to confirm their support of the Restructuring in order for the scheme process to formally commence.

73.    In addition, the sole voting shareholder of each of the Manager, the Private Fund and the Reinsurer has also passed written shareholder resolutions that each of these three entities be wound-up.

74.    It is anticipated that on the first return date of this Petition an application will be made for an adjournment to allow time for the Companies to obtain investor support for the launch of the Schemes and the Restructuring.  In the event that the requisite levels of investor support are not obtained, and the Board determines not to proceed with the launch of the Scheme, it is anticipated that the Board will then determine whether the Company should enter into full liquidation and therefore seek to continue with the Petition.

75.    The terms of the orders sought for the appointment of the JPLs provide for, *inter alia*, the continuation of the current management of the Companies during this process, with the JPLs monitoring the activities of the existing boards of directors of each the Company, Public Fund, Manager and Reinsurer entities in promoting the Restructuring and the Schemes and, in that capacity, reporting to this Court if it appears that the Restructuring may be no longer in the interests of creditors and investors (in which case, the Companies may proceed to enter into the Liquidation Scenario).

**YOUR PETITIONER THEREFORE HUMBLY PRAYS AS FOLLOWS:**

1.    That the Company be wound up by order of the Court under the provisions of the Companies Act and the SAC Act;

2.    That Simon Appell of AlixPartners UK LLP and John C. McKenna of Finance & Risk Services Ltd. be appointed as joint provisional liquidators of the Company;

17

3.      That such other order may be made in the premises as shall be just; and

4.      That the costs of and occasioned by this Petition be paid out of the assets of the Company.


Dated this 27th day of September 2021

ASW LAW LIMITED
Crawford House
50 Cedar Avenue
Hamilton HM 11
Attorneys for the Petitioner


**NOTE:** It is intended to serve this petition on the Registrar of Companies and the Bermuda Monetary Authority.


It is ordered that this Petition shall be heard before the court sitting on the         day of         at         o'clock in the         -noon.


Dated this         day of         2021


REGISTRAR


650560

18

# IN THE SUPREME COURT OF BERMUDA
## COMMERCIAL COURT
## COMPANIES (WINDING UP)
### 2021: No.

# IN THE MATTER OF CATCO REINSURANCE
# OPPORTUNITIES FUND LTD.
# AND IN THE MATTER OF THE COMPANIES ACT 1981

---

## PETITION

---





ASW Law Limited | Crawford House
50 Cedar Avenue | Hamilton, HM11
BERMUDA



Attorneys to the Petitioner

KALG/7363-005

**EXHIBIT A-3**

**Winding-Up Petition of Markel CATCo Investment Management Ltd.**

**IN THE SUPREME COURT OF BERMUDA**
**COMMERCIAL COURT**
**COMPANIES (WINDING UP)**
**2021: No.**

**IN THE MATTER OF MARKEL CATCO INVESTMENT MANAGEMENT LTD.**
**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**PETITION**

---

**THE HUMBLE PETITION** of Markel CATCo Investment Management Ltd. (the "**Company**" or the "**Petitioner**") showeth as follows:

## I.    INTRODUCTION

1.    The Company was incorporated under the Companies Act 1981, as amended (the "**Companies Act**"), as an exempted company on 2 September 2015.  The Company was originally incorporated under the name of 'Primus Investment Management Limited' on 2 September 2015, and subsequently changed its name to Markel CATCo Investment Management Ltd. on 8 September 2015.  The Company holds an investment business licence issued by the Bermuda Monetary Authority (the "**BMA**") under the Investment Business Act 2003 and an Insurance Management licence issued by the BMA under the Insurance Act 1978, as amended.

2.    The registered office of the Company is at Crawford House, 50 Cedar Avenue, Hamilton HM11, Bermuda.

3.    The Company's objects and powers are unrestricted.

4.    The authorised share capital of the Company is US$ 12,000 divided into 12,000 shares of par value US$ 1.00 each.

## II.    BACKGROUND TO THE COMPANY AND ITS OPERATION

5.    In 2015, Markel Corporation, an entity incorporated in the Commonwealth of Virginia, United States of America ("**Markel Corporation**"), acquired the insurance linked securities business operated by CATCo Investment Management Limited, a Bermuda

1

incorporated company. As a result of this acquisition, the Company was incorporated on 2 September 2015 in order to take over the role of CATCo Investment Management Limited. Within the CATCo Group structure, the Company is referred to as the "**Manager**". References in this Petition to the 'Manager' are to the Company.

6. From 2015 to 2019, the Manager managed a reinsurance and retrocessional reinsurance business (the "**Markel CATCo business**"). Under the Markel CATCo business capital was raised by soliciting investments through a fund structure operated by the Public Fund and Markel CATCo Reinsurance Fund Limited (the "**Private Fund**"), a mutual fund company which is registered as a segregated account company under the Segregated Accounts Companies Act 2000, as amended (the "**SAC Act**"). In accordance with the CATCo Group's (as defined below) offering documents, such investor capital was ultimately invested in Markel CATCo Re Limited (the "**Reinsurer**"), by way of the segregated accounts operated by the Private Fund subscribing for shares in the Reinsurer. Each class of shares issued by the Reinsurer was linked to specific reinsurance products, as described further below.

7. The Manager, Company, Public Fund and Reinsurer are referred to collectively as the "**CATCo Group**" or the "**Companies**". Further detail in respect of each of the Companies, including a simplified structure chart illustrating the current corporate and fund structure of the CATCo Group, is set out in the first affidavit of Federico Alejandro Candiolo dated 27 September 2021, filed in support of this winding-up petition (the "**Candiolo Affidavit**").

8. The Manager is an indirect, wholly owned subsidiary of Markel Corporation, and is the owner of 100% of the voting shares of each of the Private Fund and the Reinsurer. As described more fully below, the Manager is responsible for the day-to-day management of the Private Fund and Reinsurer, and for providing certain management services to the Public Fund.

9. The Reinsurer is registered with the BMA as a Class 3 Insurer under the Insurance Act 1978. As part of the Markel CATCo business, the Reinsurer provided catastrophic risk reinsurance and retrocessional ("**retro**") reinsurance to its clients, covering extraordinary

losses incurred in respect of certain regions and certain natural disasters within a defined time period, usually a calendar year. The Reinsurer was funded by investor capital raised directly by the Private Fund, and raised indirectly by the Public Fund on the Specialist Fund Segment of the London Stock Exchange (with secondary listing on the Bermuda Stock Exchange), pursuant to the investment structure described in outline at paragraph 10 below. The reinsurance policies issued by the Reinsurer were, and those that remain subject to the reinsurance run-off process are, fully collateralised, meaning that the Reinsurer held and continues to hold cash and cash equivalent assets in a separate trust account for each reinsurance contract equivalent to the full potential liability under the contract. The collateral comprised the premium paid by the reinsurance clients, plus an allocation of the proceeds of investments from the Private Fund and, indirectly, the Public Fund.

10. In respect of the structure of investments in the Markel CATCo business, in summary, private investors would invest directly through the Private Fund and public and institutional investors invested in the Public Fund, which in turn invested directly in the Private Fund. In essence, therefore, the Public Fund operated as a "feeder fund" through which public and institutional investors were able to invest indirectly in the Master Fund, a segregated account, of the Private Fund (as described at paragraph 13 below).

**A.   The Management Agreements**

11. The Manager is responsible for the day-to-day management of the Private Fund and Reinsurer, and for providing certain management services to the Public Fund. The Manager provides such management services to the Private Fund, Public Fund and Reinsurer pursuant to the following agreements:

   (a)   an investment management agreement dated 8 December 2015 entered into between the Manager and the Private Fund (on behalf of each fund the Private Fund operates);

   (b)   an investment management agreement dated 8 December 2015 between the Public Fund and the Manager; and

650558

3

(c)    an insurance management agreement between the Manager and the Reinsurer dated 8 December 2015,

collectively, these agreements are referred to as the "**Management Agreements**".

12.    Under their respective Management Agreements, each of the Private Fund, the Public Fund and the Reinsurer have provided broad indemnities to the Manager and its affiliates and others in respect of claims arising out of the Manager's performance of its duties under the Management Agreements, other than claims for negligence, gross or wilful negligence, wilful default, fraud and dishonesty (depending on the particular wording used in each Management Agreement). Further detail in respect of the Management Agreements is set out in the Candiolo Affidavit.

## III.    FUND STRUCTURE OPERATED BY THE PRIVATE FUND

13.    The Private Fund operates eight funds, namely: (i) Master Fund; (ii) Diversified Fund II; (iii) Limited Diversified Arbitrage Fund; (iv) Diversified Arbitrage Fund; (v) GTL Diversified Fund; (vi) Markel Diversified Fund; (vii) QIC Diversified Fund; and (viii) Aquilo Fund (collectively, the "**Funds**", and each, a "**Fund**"). The Funds are segregated accounts of the Private Fund, meaning that each Fund is a separate individually managed pool of assets with its own investment objective and policies.

14.    Excluding the Aquilo Fund, the other seven Funds are connected, with each of (i) Diversified Fund II; (ii) Limited Diversified Arbitrage Fund; (iii) Diversified Arbitrage Fund; (iv) GTL Diversified Fund; (v) Markel Diversified Fund; and (vi) QIC Diversified Fund, in that each of (ii) through (vii) holds investments in the Master Fund. These six Funds, plus the Master Fund, are collectively referred to as the "**Retro Funds**".

15.    The funds and investments operated by the Private Fund can be broadly divided into two categories: (i) the investments in, and investments made by, the Aquilo Fund; and (ii) the investments in, and investments made by, the Retro Funds.

A.    **The Side Pockets**

16.    The Bye-Laws of the Private Fund enable its directors to create 'side-pockets' ("**SPs**", or, in the case of a single side-pocket, an "**SP**") where desirable to do so to manage the liquidity of the Funds.  A SP constitutes a distinct class of shares issued in respect of any particular Fund, holders of which are entitled to share in a defined pool of illiquid assets subject to run-off periods.  The Private Fund utilised SPs at the end of each calendar year to fix the interests of investors in the capital trapped in insurance policies for such year:

(a)    In the Master Fund, SPs were created at the end of each of 2016, 2017, 2018 and 2019.

(b)    In the Aquilo Fund, side pockets were created at the end of each of 2014 through 2020.

17.    During 2019 the Private Fund decided to run-off the Retro Funds and return capital to investors (as described further below).  At the end of 2019, all of the assets of the Retro Funds that were not able to be distributed to investors were placed into SP 2019.  The entire issued share capital of both the Aquilo Fund and the Master Fund now comprises SP shares.

IV.    **RECENT DEVELOPMENTS**

A.    **Losses in 2017 through 2019 and the Decision to Run-Off**

18.    While the Master Fund, and therefore the Private Fund operated profitably in other years, in 2017 and 2018, the Master Fund (and, as a consequence, all investors in the Private Fund and the Public Fund) suffered severe losses as a result of the occurrence of a number of unprecedented catastrophic events.  Three hurricanes (Irma, Harvey and Maria) and several wildfires occurred in four different geographic regions.  In 2018, Typhoon Jebi, Hurricanes Michael and Florence, and further California wildfires occurred.  2017 ranks as the record year for catastrophic-risk insured losses since records commenced about a century ago, and 2018 ranks as the fourth-highest year of catastrophic-risk insured losses.  Consequently, investors in the Markel CATCo business suffered material losses on their investments.

5

19.     Following a second year of losses in 2018, the Manager extended a special redemption
        option to investors of the Private Fund and, in view of the majority uptake, decided to cease
        offering new investment in the Funds.  Accordingly, at the end of the 2019 policy year, all
        remaining capital in the Funds, other than that trapped as collateral for insurance policies,
        was returned to investors.

20.     On 26 March 2019, investors in the Public Fund voted to approve the orderly run-off of its
        investments in the Master Fund.  The Public Fund's investment policy is now limited to
        realising the Public Fund's assets and distributing any net proceeds to the relevant
        shareholders.

21.     On 25 July 2019, the Manager announced that it would cease accepting new investments
        in the Private Fund and the Funds operated by it, and would not write any new business
        going forward through the Reinsurer.  The Manager has commenced the orderly run-off of
        the Reinsurer's existing portfolio, which is expected to take at least three years from
        January 2020.

22.     The Manager has since continued to manage the retro and reinsurance portfolios, in order
        to run-off the policies in an orderly manner and, subject to approval from the Bermuda
        Monetary Authority, return capital to investors as it is released from the trust accounts to
        the Reinsurer.

**B.     Investor Litigation**

23.     In October 2020, an investor in the Private Fund through the Limited Diversified Arbitrage
        Fund, Eugenia II Investment Holdings Limited ("**Eugenia**") filed suit against the former
        chief executive officer of the Manager, Anthony Belisle ("**Belisle**"), in the U.S. District
        Court for the Middle District of Florida (the "**Florida Court**") alleging fraudulent
        misrepresentation and negligent misrepresentation for statements made in 2017 related to
        Eugenia's investment for policy year 2018 (the "**Eugenia Litigation**").  Eugenia sought
        compensation for losses suffered as a result of its investment in the Retro Funds in 2018,
        and claimed US$ 7.5 million plus costs and punitive damages.

24.     In January 2021, Belisle, through counsel, filed a motion to dismiss the Eugenia Litigation.

25.  In reliance on an indemnity from the Manager pursuant to the terms of his former employment contract, Belisle demanded that the Manager meet his costs of defending the Eugenia Litigation, and the amount of any judgment, and took steps to have the Manager joined as a defendant to the Litigation although the Manager was not formally joined.

26.  The Eugenia Litigation was settled on a confidential basis without admission of liability by Belisle or the Manager.  Eugenia was paid an amount in settlement of its claims which reflected an assessment of the likelihood of success of the claim and comparatively large legal costs the Manager would be likely to incur in defending the proceeding had it been joined.  The Manager claimed the amount of the settlement from its D&O insurance cover, meaning that there was no material depletion of Fund assets.

27.  Following the Eugenia Litigation, another investor in the Markel CATCo business has separately threatened to commence litigation against Belisle and/or the Manager based on similar allegations to those advanced in Eugenia Litigation, however no such litigation has yet been commenced.

28.  Against the background of the substantial losses suffered by the Funds in both 2017 and 2018, and in light of the Eugenia Litigation and the other, threatened investor litigation, the board of directors of the Company (the "**Board**") is now concerned that other investors may seek to commence claims against the Company, Private Fund, Public Fund or Reinsurer, or other persons entitled to indemnities from such entities ("**Investor Claims**").

29.  Although it is impossible to predict every claim an investor might seek to bring, a purely hypothetical example of the type of claim an investor might seek to commence, based on the Eugenia Litigation, would be on the basis of statements or omissions made in the CATCO Group's investor communications and offering materials.

30.  Whilst the Company does not believe these Investor Claims to be valid for various reasons, if investors were to bring Investor Claims, then these claims would all be substantially similar and all investors in the relevant year to which the claims relate would likely have an equivalent claim.  Obligations that the CATCo Group and its affiliates have with respect to their operations and professional conduct are common to all investors.  If, contrary to

the view of the Company, there was any actionable statement or omission in any of the disclosure documents, claims based on such statements would be available to all investors.

**C.      Consequences of Investor Claims**

31.     The boards of directors of the CATCo Group companies do not consider that any potential Investor Claims would succeed for a number of reasons.  For example, the CATCo Group's offering materials included disclosures around the risk factors that could impact an investment.  Marketing materials, including presentations, contained similar disclosures regarding the information provided therein, including the hypothetical nature of the information in those materials.  The disclosures make clear that the model simulations or hypotheticals contained in the presentations should not be relied on as an indication of the characteristics of the actual portfolio.  These are but a few of the examples of the substantial barriers to the Investor Claims.

32.     Furthermore, in 2018 in response to requests from certain U.S. governmental authorities, Markel Corporation engaged Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**") to undertake a thorough review of the loss reserving process for catastrophic events that occurred in 2017 and reserve-related disclosures that the CATCo Group made.  The internal review was completed in April 2019 and Skadden found no evidence that CATCo Group personnel acted in bad faith in exercising their business judgment in the setting of reserves and making related disclosures during late 2017 and early 2018.

33.     Nevertheless, if such further Investor Claims were brought, similar to the Eugenia Litigation, against current or former executive employees of the Manager, it is possible that the Manager would be required, pursuant to indemnities provided under certain of the employment contracts it entered into, to satisfy the likely significant costs of defending such claims and any judgment that was awarded.  Furthermore, in such event, the Manager would likely seek to claim on the indemnities provided in the Management Agreements by the Private Fund, the Public Fund and Reinsurer.

34.     The Manager's D&O/E&O insurance cover potentially applicable to these claims is now impaired by approximately thirty-five percent, and there is no other pool of assets available to satisfy further Investor Claims.  Consequently, whilst the settlement of the Eugenia

Litigation was funded from insurance proceeds, if further Investor Claims are brought there will not be enough insurance coverage and it may be necessary to satisfy the costs of such claims, and any judgment, from the assets of the Funds.

35.    The costs of defending such Investor Claims could be significant. The Manager believes that the indemnification costs associated with the Eugenia Litigation would have been several million dollars. There would have been several million dollars in additional costs borne by the Manager, and through indemnification with the Private Fund and Public Fund, as the Manager responded to various discovery requests in that litigation. Additionally, costs would multiply if litigation was pursued against more than one defendant (e.g., if a lawsuit were filed against multiple current or former employees or against current or former employees and the Manager).

36.    Further, notwithstanding the boards' view of the likelihood of success of any potential Investor Claims, there is inherently an element of risk in any litigation, particularly in jurisdictions where liability and quantum are determined by jury.

37.    The liability of the Private Fund, Public Fund or Reinsurer for such amounts pursuant to the indemnities would be an unsecured claim, and would be required to be paid prior to any return of capital to investors. Accordingly, any such liabilities would deplete the net asset value of the SPs available to be returned to investors.

38.    The net asset value of each investor's interest in each SP is proportionate to the size of their original investment, and according to the amount of any loss suffered in respect of such year. Accordingly, if a court were to uphold any Investor Claims and award damages by reference to the loss made on the investment, they would likely be for damages in proportion to their holdings in each SP. If, however, some but not all investors were to commence Investor Claims, the pool of available assets could be reduced for the benefit of some but not all investors and the investors that brought such claims could attempt to place themselves in a position to receive recoveries ahead of, and at the expense of, other equity investors in the Markel CATCo business whose rights should rank *pari passu*. This scenario would likely lead to a liquidation of the Companies in order to avoid that inequitable result. Given that all investors in either the Private Fund or Public Fund are

invested directly or indirectly in the same business, there is little justification for any investor to be able to 'jump the queue' and obtain an advantage over other investors by way of litigation.

39.   Finally, given the scale of the losses suffered by investors in the Funds in 2017 and 2018 (in excess of US$ 3 billion), if any substantial portion of investors were to assert Investor Claims, the potential liability of the Manager, the Private Fund, the Public Fund or the Reinsurer could easily exceed the remaining net asset value of the Funds, rendering the relevant segregated accounts – or, in the case of the Reinsurer, its general account – insolvent.

## V.   PROPOSED RESTRUCTURING

### A.   The Restructuring Proposal

40.   Markel Corporation has decided to make a buy-out proposal available to investors in the Private Fund and the Public Fund (the "**Buy-Out Transaction**", and the implementation of the Buy-Out Transaction, the "**Restructuring**"),  in order to: (i) prevent any dissipation of Fund assets as a result of Investor Claims; (ii) provide for an early return of capital to investors rateably in proportion to their interests in the SPs, and therefore ensure that all investors are treated alike and none gain an unfair advantage through litigation; and (iii) avoid the potential for Investor Claims and the consequent risk of an insolvent liquidation of the CATCo Group entities.

41.   Under the Buy-Out Transaction, it is intended that both the Private Fund and the Public Fund (each, a "**Scheme Company**", and together, the "**Scheme Companies**") will propose the entry into two creditor schemes of arrangement in Bermuda, under section 99 of the Companies Act (the "**Schemes**").   The Schemes will be conditional upon each other. Further detail in respect of the proposed terms of the Schemes is set out at sub-section C below.

42.   The boards of directors of the Scheme Companies believe that the Schemes would be beneficial to all investors (who are believed to be the only material stakeholders of the Companies), if they are to proceed, in that it will provide for an early return of capital to

investors rateably in proportion to their interests in the SPs, and prevent any dissipation of fund assets as a result of Investor Claims. In particular, the Schemes will avoid the risk of an insolvent liquidation in the event that multiple Investor Claims are brought against the Company, or other entities within the CATCo Group (with resulting indemnity claims against the Company), in the future. Furthermore, if approved by investors and sanctioned by the Bermuda Court, the Schemes will resolve the Solvency Question, enabling the Reinsurer and Private Fund to continue to run-off the Fund assets in the ordinary course.

43. The launch of the Schemes is dependent on whether sufficient levels of investor support are obtained. On or about the time of filing the petition for the winding-up of the Company – which is intended to take place simultaneously with the Private Fund, Public Fund and Reinsurer filing their own winding-up petitions – and of the application to appointment of the JPLs in respect of the same, the Manager intends to publicly announce the Buy-Out Transaction, with support from the boards of directors of the Companies. Following the public announcement of the Buy-Out Transaction, investors in both the Private Fund and Public Fund will be given several weeks in which to provide an undertaking to support the Buy-Out Transaction and relevant Scheme, and in doing so become eligible to receive an early consent fee. During this period, the Companies will engage with investors in the Private Fund and the Public Fund to obtain their support. The Companies will also consult with the JPLs in relation to the Schemes, before proceeding to launch them.

44. Based on preliminary discussions held with investors to date, the Companies expect that investors in the Public Fund and the Private Fund are likely to support the Buy-Out Transaction and agree to approve the Schemes. However, if sufficient investors do not agree to support the Schemes, the Private Fund and the Public Fund will need to determine the appropriate course of action, which could include entry into full liquidations (this latter scenario is referred to as the "**Liquidation Scenario**").

45. As described in detail in the Candiolo Affidavit, whether the scheme process is formally launched or not, the mandatory stay arising from the order appointing the JPLs will protect the CATCo Group entities from the negative impact of potential Investor Claims and therefore to preserve the amount of funds to be returned to investors. This will be

especially beneficial during the process of seeking investor support to launch the Schemes, and also during the implementation of the Schemes.  In the event that the Schemes are <u>not</u> launched, and the CATCo Group entities decide to commence ordinary, full liquidations, the CATCo Group entities will have the benefit of having provisional liquidators already in place who would be, at that point, already very familiar with the Companies' operations and finances.

46.     For the Court's reference, sub-section C below provides a summary overview of the proposed terms of the two Schemes (although it should be noted that these may be subject to change).

**B.     AlixPartners' Analysis**

47.     As part of preparing for the development and proposal of the Schemes, the CATCo Group retained AlixPartners UK LLP ("**AlixPartners**") at the end of May 2021 to prepare a report that analyses the outcomes to investors arising from the Schemes compared to potential scenarios arising in the absence of the Schemes.

48.     AlixPartners' report modelled two hypothetical alternative scenarios (1) a liquidation with very limited unsuccessful loss claims brought by investors; and (2) a liquidation with some loss claims that were successful.  In each case, there were a number of downside factors that could impact investor returns whether or not the claims were successful, including: (i) the costs of the liquidation process; (ii) the legal fees associated with adjudicating any claims; and (iii) the increased creditor pool arising from any admitted claims.  The report found that the outcomes for each scenario were materially worse for investors than under the Schemes.

49.     Further detail in respect of AlixPartners work, carried out on behalf of the CATCo Group prior to Simon Appell's appointment one of the JPLs, is set out in the Candiolo Affidavit.

**C.     The Buy-Out Transaction and the Schemes**

50.     The Schemes will seek to implement a cash buy-out of all or substantially all of the investors' shares in the Retro Funds, and an early return of value to investors in the Aquilo Fund.  Markel Corporation will provide funding to the Private Fund to allow an early return

of capital to investors. In consideration for the return of capital, the investors, the Companies, Markel Corporation and each of their related parties will provide mutual releases pursuant to which they will release each other from any and all claims of whatever nature arising out of the Companies' businesses and/or the investors' shares (the "**Releases**").

51. If approved by investors and sanctioned by the Court, the Schemes will resolve the Solvency Question described above, enabling the CATCo Group to make further distributions to investors and continue to run-off the remaining Fund assets in the ordinary course.

### 1. *Distribution to investors in the Retro Funds*

52. Certain wholly owned subsidiaries of Markel Corporation (the "**Funding Cos**"), will provide funds (the "**Buy-Out Amount**") to the Private Fund to enable it to distribute to investors in the Retro Fund (including the Public Fund) on or shortly after the closing date (the "**Closing Date**"), each investor's proportional entitlement to:

(a)     100% of the Closing NAV of the 2016 Master Fund SP;

(b)     100% of the Closing NAV of the 2017 Master Fund SP;

(c)     90% of the Closing NAV of the 2018 Master Fund SP; and

(d)     80% of the Closing NAV of the 2019 Master Fund SP,

(together, the "**Retro Fund Accelerated Distribution**").

53. 'Closing NAV' represents current NAV adjusted for costs of the Buy-Out Transaction and a reserve for the estimated operating and other fees to run-off the Funds.

54. In addition to the Retro Fund Accelerated Distribution, investors in the 2018 Master Fund SP and 2019 Master Fund SP will also remain entitled to their remaining portion of Closing NAV, and all investors will remain entitled to receive any upside, should NAV increase, after the return of the Buy-Out Amount to the Funding Cos.

55.    The Retro Fund Accelerated Distributions will be funded from a combination of (i) the amount of assets available for distribution to investors in a particular SP on the Closing Date as determined by the Manager in accordance with past practice, relevant bye-laws and supplemental offering memorandum, (ii) cash on hand at the relevant Retro Fund and (iii) the Buy-Out Amount to be provided by the Funding Cos.

56.    The Buy-Out Amount shall be advanced by the Funding Cos to a wholly-owned subsidiary (the "**Purchaser**") of Markel Corporation. The Purchaser shall acquire shares in the Reinsurer from the Master Fund and the Master Fund will then use the Buy-Out Amount to make the Retro Fund Accelerated Distributions.

### 2.    *Distributions to investors in the Aquilo Fund*

57.    For the Aquilo Fund, a substantial portion of the Fund assets are currently held by a rated fronting reinsurer (the "**Fronting Reinsurer**") as protection against any reserve strengthening required on certain policies. In order to facilitate an early release of such capital, a wholly-owned subsidiary of Markel Corporation will provide an adverse development cover to the Fronting Reinsurer that will enable the release of $100 million to the Private Fund, which will be returned to investors in the Aquilo Fund less an allocation of the costs of the Buy-Out Transaction and a reserve on account of the likely costs to run-off the remainder of the Aquilo Fund assets.

### 3.    *Distributions to investors in the Public Fund*

58.    The Public Fund is an investor in the Master Fund, and will receive its Retro Fund Accelerated Distribution in accordance with the Private Fund Scheme. The Public Fund has issued two classes of shares: Ordinary Shares and C Shares. Further detail in respect of the shareholding structure in the Public Fund is set out in the Candiolo Affidavit.

59.    The amounts received by the Public Fund will be distributed to holders of Ordinary Shares and C Shares in accordance with their proportionate entitlements and in accordance with the Public Fund Bye-Laws.

### 4.    *The Releases*

60.    The Schemes will provide that investors, the Companies, Markel Corporation and their related parties and affiliates grant the Releases.  Pursuant to the Schemes all investors will release any potential Investor Claims against the Reinsurer, the Scheme Companies, the JPLs, the Manager, Markel Corporation, the advisors to the Companies and the JPLs and the various other parties entitled to an indemnity under the Management Agreements.

## VI.   RESOLUTION TO COMMENCE WINDING-UP PROCEEDINGS

61.    The directors of the Company have the power under the Company's bye-laws to "*present any petition and make any application in connection with the liquidation or reorganisation of* [the] *Company*".

62.    In order to facilitate the implementation of the Restructuring, between 9 to 17 September 2021, the boards of directors of each of the Company, the Scheme Companies and the Reinsurer, pursuant to their powers under the respective bye-laws, unanimously approved a written resolution to:

   (a)    commence winding-up proceedings by the presentation of a petition to the Supreme Court under the provisions of the Companies Act, section 161(a); and

   (b)    seek the appointment of Simon Appell of AlixPartners UK LLP and John C. McKenna of Finance & Risk Services Ltd. as joint provisional liquidators (the "**JPLs**") to monitor the implementation of the Schemes, with, in the first instance, powers of oversight, leaving the existing boards of directors of each of the Companies responsible for the Restructuring.

63.    The sole voting shareholder of the Company, Alterra Capital Holdings Limited, has also passed a written resolution to wind the Company up under section 161(a) of the Companies Act.

64.    It is anticipated that on the first return date of this Petition an application will be made for an adjournment to allow time for the Companies to obtain investor support for the launch of the Schemes and the Restructuring.  In the event that the requisite levels of investor support are not obtained, and the Board determines not to proceed with the launch of the

650558

15

Scheme, it is anticipated that the Board will then determine whether the Company should enter into full liquidation and therefore seek to continue with the Petition.

65.    The terms of the orders sought for the appointment of the JPLs provide for, *inter alia*, the continuation of the current management of the Companies during this process, with the JPLs monitoring the activities of the existing boards of directors of each the Private Fund, Public Fund, Manager and Reinsurer entities in promoting the Restructuring and the Schemes and, in that capacity, reporting to this Court if it appears that the Restructuring may be no longer in the interests of creditors and investors (in which case, the Companies may proceed to enter into the Liquidation Scenario).

**YOUR PETITIONER THEREFORE HUMBLY PRAYS AS FOLLOWS:**

1.    That the Company be wound up by order of the Court under the provisions of the Companies Act;

2.    That Simon Appell of AlixPartners UK LLP and John C. McKenna of Finance & Risk Services Ltd. be appointed as joint provisional liquidators of the Company;

3.    That such other order may be made in the premises as shall be just; and

4.    That the costs of and occasioned by this Petition be paid out of the assets of the Company.


Dated this 27th day of September 2021

ASW LAW LIMITED
Crawford House
50 Cedar Avenue
Hamilton HM 11
Attorneys for the Petitioner


**NOTE:** It is intended to serve this petition on the Registrar of Companies.

650558

It is ordered that this Petition shall be heard before the court sitting on the          day of
at          o'clock in the          -noon.


Dated this          day of                    2021


_____
REGISTRAR

650558

### IN THE SUPREME COURT OF BERMUDA
### COMMERCIAL COURT
### COMPANIES (WINDING UP)
### 2021: No.

### IN THE MATTER OF MARKEL CATCO INVESTMENT MANAGEMENT LTD.
### AND IN THE MATTER OF THE COMPANIES ACT 1981

---

### PETITION

---





ASW Law Limited | Crawford House
50 Cedar Avenue | Hamilton, HM11
BERMUDA

Attorneys to the Petitioner

KALG/7363-005



**EXHIBIT A-4**

**Winding-Up Petition of Markel CATCo Re Ltd.**

**IN THE SUPREME COURT OF BERMUDA**
**COMMERCIAL COURT**
**COMPANIES (WINDING UP)**
2021: No.

**IN THE MATTER OF MARKEL CATCO RE LTD.**
**AND IN THE MATTER OF THE COMPANIES ACT 1981**
**AND IN THE MATTER OF THE INSURANCE ACT 1978**
**AND IN THE MATTER OF THE SEGREGATED ACCOUNTS COMPANIES ACT 2000**

---

**PETITION**

---

**THE HUMBLE PETITION** of Markel CATCo Re Ltd. (the "**Company**" or the "**Petitioner**")
showeth as follows:

## I.    INTRODUCTION

1.    The Company was incorporated as an exempted company under the Companies Act 1981,
as amended (the "**Companies Act**"), on 14 September 2015.  The Company is registered
as a segregated accounts company under the Segregated Accounts Companies Act 2000,
as amended (the "**SAC Act**").  It is registered with the Bermuda Monetary Authority (the
"**BMA**") as a Class 3 Insurer under the Insurance Act 1978, as amended.

2.    The registered office of the Company is at Crawford House, 50 Cedar Avenue, Hamilton
HM11, Bermuda.

3.    The Company's objects and powers are unrestricted.

4.    The authorised share capital of the Company is US$ 12,000,000.00 divided into 120,000
common shares of par value US$ 1.00 each and 11,880,000,000 preference shares of par
value US$ 0.001 each.  The minimum issued share capital of the Company is US$
120,000.000 fully paid comprising 120,000 common shares of par value US$ 1.00 each.

650561

1

## II.    BACKGROUND TO THE COMPANY AND ITS OPERATION

5.      In 2015, Markel Corporation, an entity incorporated in the Commonwealth of Virginia, United States of America ("**Markel Corporation**"), acquired the insurance linked securities business operated by CATCo Investment Management Limited, a Bermuda incorporated company.   As a result of this acquisition, Markel CATCo Investment Management Ltd. (the "**Manager**") was incorporated on 2 September 2015 in order to take over the role of CATCo Investment Management Limited.   Within this structure, the Company is referred to as the "**Reinsurer**".   References in this Petition to the 'Reinsurer' are to the Company.

6.      From 2015 to 2019, the Manager managed a reinsurance and retrocessional reinsurance business (the "**Markel CATCo business**").   Under the Markel CATCo business capital was raised by soliciting investments through a fund structure operated by CATCo Reinsurance Opportunities Fund Limited, a mutual fund company (the "**Public Fund**") and by Markel CATCo Reinsurance Fund Limited (the "**Private Fund**"), a mutual fund company which is registered as a segregated account company under the Segregated Accounts Companies Act 2000, as amended (the "**SAC Act**").   In accordance with the CATCo Group's (as defined below) offering documents, such investor capital was ultimately invested in the Company, by way of the segregated accounts operated by the Private Fund subscribing for shares in the Company.   Each class of shares issued by the Company was linked to specific reinsurance products, as described further below.

7.      The Company, Manager, Private Fund and Public Fund are referred to collectively as the "**CATCo Group**" or the "**Companies**".   Further detail in respect of each of the Companies, including a simplified structure chart illustrating the current corporate and fund structure of the CATCo Group, is set out in the first affidavit of Federico Alejandro Candiolo dated 27 September 2021, filed in support of this winding-up petition (the "**Candiolo Affidavit**").

8.      The Company provided catastrophic risk reinsurance and retrocessional ("**retro**") reinsurance to its clients, covering extraordinary losses incurred in respect of certain regions and certain natural disasters within a defined time period, usually a calendar year.

2

650561

The Company was funded by private investor capital raised directly by the Private Fund, and raised indirectly by the Public Fund on the Specialist Fund Segment of the London Stock Exchange (with secondary listing on the Bermuda Stock Exchange), pursuant to the investment structure described in outline at paragraph 9 below. The reinsurance policies issued by the Reinsurer were, and those that remain subject to the reinsurance run-off process are, fully collateralised, meaning that the Reinsurer held and continues to hold cash and cash equivalent assets in a separate trust account for each reinsurance contract equivalent to the full potential liability under the contract. The collateral comprised the premium paid by the reinsurance clients, plus an allocation of the proceeds of investments from the Private Fund and, indirectly, the Public Fund.

9.      In respect of the structure of investments in the Markel CATCo business, in summary, private investors would invest directly through the Private Fund and public and institutional investors invested in the Public Fund, which in turn invested directly in the Private Fund. In essence, therefore, the Public Fund operated as a "feeder fund" through which public and institutional investors were able to invest indirectly in the Master Fund, a segregated account, of the Private Fund.

10.     The Manager entered into management agreements with each of the Company, the Private Fund and the Public Fund (the "**Management Agreements**") under which the Company, the Private Fund and the Public Fund provided broad indemnities to the Manager and its affiliates and others in respect of claims arising out of the Manager's performance of its duties under the Management Agreements, other than claims for negligence, gross or wilful negligence, wilful default, fraud and dishonesty (depending on the particular wording used in each Management Agreement). Further detail in respect of the Management Agreements is set out in the Candiolo Affidavit.

## III.    FUND STRUCTURE OPERATED BY THE PRIVATE FUND

11.     The Private Fund operates eight funds, namely: (i) Master Fund; (ii) Diversified Fund II; (iii) Limited Diversified Arbitrage Fund; (iv) Diversified Arbitrage Fund; (v) GTL Diversified Fund; (vi) Markel Diversified Fund; (vii) QIC Diversified Fund; and (viii) Aquilo Fund (collectively, the "**Funds**", and each, a "**Fund**"). The Funds are segregated

accounts of the Private Fund, meaning that each Fund is a separate individually managed pool of assets with its own investment objective and policies.

12.  Excluding the Aquilo Fund, the other seven Funds are connected, with each of (i) Diversified Fund II; (ii) Limited Diversified Arbitrage Fund; (iii) Diversified Arbitrage Fund; (iv) GTL Diversified Fund; (v) Markel Diversified Fund; and (vi) QIC Diversified Fund, in that each of (ii) through (vii) holds investments in the Master Fund.  These six Funds, plus the Master Fund, are collectively referred to as the "**Retro Funds**".

13.  The funds and investments operated by the Private Fund can be broadly divided into two categories: (i) the investments in, and investments made by, the Aquilo Fund; and (ii) the investments in, and investments made by, the Retro Funds.

**A.    The Side Pockets**

14.  The Bye-Laws of the Private Fund enable its directors to create 'side-pockets' ("**SPs**", or, in the case of a single side-pocket, an "**SP**") where desirable to do so to manage the liquidity of the Funds.  A SP constitutes a distinct class of shares issued in respect of any particular Fund, holders of which are entitled to share in a defined pool of illiquid assets subject to run-off periods.  The Private Fund utilised SPs at the end of each calendar year to fix the interests of investors in the capital trapped in insurance policies for such year:

(a)  In the Master Fund, SPs were created at the end of each of 2016, 2017, 2018 and 2019.

(b)  In the Aquilo Fund, side pockets were created at the end of each of 2014 through 2020.

15.  During 2019 the Private Fund decided to run-off the Retro Funds and return capital to investors (as described in further detail below).  At the end of 2019, all of the assets of the Retro Funds that were not able to be distributed to investors were placed into SP 2019.  The entire share capital of both the Aquilo Fund and the Master Fund now comprises SP shares.

4

## IV.    THE COMPANY'S INSURANCE BUSINESS

16.    As noted above, the Company is registered with the BMA as a Class 3 Insurer.  The Company wrote two types of reinsurance business: retrocessional (or 'retro') coverage for reinsurers ("**cedants**") in respect of the Retro Funds, and ordinary reinsurance in respect of the Aquilo Fund.

17.    Each policy written by the Reinsurer is held within a separate segregated account, 100% of the share capital of which is owned by either the Master Fund or the Aquilo Fund.

### 1.    *Retro Policies*

18.    The retro policies written by the Reinsurer in respect of the Master Fund typically comprised fully collateralised one-year policies.  Investors' capital is held as cash and cash equivalents assets in a trust account held in New York, United States of America, for the benefit of the relevant cedant (each a "**Trust Account**" or "**Trust Accounts**").  When loss events occur during the policy year, the Manager uses its judgment to set loss reserves that it believes will be sufficient to cover claims under the relevant policies.  The total liability in respect of any policy is not typically known at the end of the policy year, as additional claims are made to the underlying insurer, and reinsurer, in periods after the policy year.  Accordingly, following the expiry of the policy year, cedants can 'trap' assets in the Trust Accounts to cover their ultimate exposure. As the total claims becomes more certain, and as claims are settled, the amount reserved may be reduced or increased.  The net asset value ("**NAV**"), from time to time, of any policy is the amount by which the amount trapped exceeds the loss reserves under the policy.

19.    Value is typically trapped in the Trust Accounts for three years after the policy year, after which point the Reinsurer may request commutation (settlement) of any remaining claims, with the result that all surplus funds are released.  The rationale for these three-year periods is that insurance losses take time to develop and crystallise.  If mutual consent is not reached, the contracts can remain open beyond three years.  However, partial releases are possible where buffer loss table within reinsurance contracts allow.

## 2. *Aquilo Reinsurance Policies*

20.     The reinsurance policies written by the Reinsurer in respect of the Aquilo Fund were
fronted by certain independent, rated reinsurance carriers.  As with the retro policies written
by the Reinsurer, investors' capital is contributed via the Aquilo Fund segregated account
of the Private Fund and the Aquilo segregated account of the Reinsurer to a Trust Account
to collateralise the fronting agreement with each rated carrier, and released following the
applicable year as claims are determined or commuted.

21.     Unlike the retro reinsurance policies, the reinsurance issued in respect of the Aquilo Fund
typically did not provide for mandatory commutation at the expiry of a three-year window,
meaning that value can potentially remain trapped for an extended period if claims remain
outstanding.

## V.     RECENT DEVELOPMENTS

## A.     Losses in 2017 through 2019 and the Decision to Run-Off

22.     While the Master Fund, and therefore the Private Fund operated profitably in other years,
in 2017 and 2018, the Master Fund (and, as a consequence, all investors in the Private Fund
and Public Fund) suffered severe losses as a result of the occurrence of a number of
unprecedented catastrophic events.  Three hurricanes (Irma, Harvey and Maria) and several
wildfires occurred in four different geographic regions.  In 2018, Typhoon Jebi, Hurricanes
Michael and Florence, and further California wildfires occurred.  2017 ranks as the record
year for catastrophic-risk insured losses since records commenced about a century ago, and
2018 ranks as the fourth-highest year of catastrophic-risk insured losses.  Consequently,
investors in the Markel CATCo business suffered material losses on their investments.

23.     Following a second year of losses in 2018, the Manager extended a special redemption
option to investors of the Private Fund and, in view of the majority uptake, decided to cease
offering new investment in the Funds.  Accordingly, at the end of the 2019 policy year, all
remaining capital in the Funds, other than that trapped as collateral for insurance policies,
was returned to investors.

24.     On 26 March 2019, investors in the Public Fund voted to approve the orderly run-off of its investments in the Master Fund. The Public Fund's investment policy is now limited to realising the Public Fund's assets and distributing any net proceeds to the relevant shareholders.

25.     On 25 July 2019, the Manager announced that it would cease accepting new investments in the Private Fund and the Funds operated by it, and would not write any new business going forward through the Company. The Manager has commenced the orderly run-off of the Company's existing portfolios, which is expected to take at least three years from January 2020.

26.     The Manager has since continued to manage the Company's retro and reinsurance portfolios, in order to run-off the policies in an orderly manner and, subject to approval from the Bermuda Monetary Authority, return capital to investors as it is released from the trust accounts to the Reinsurer.

**B.     Investor Litigation**

27.     In October 2020, an investor in the Private Fund through the Limited Diversified Arbitrage Fund, Eugenia II Investment Holdings Limited ("**Eugenia**") filed suit against the former chief executive officer of the Manager, Anthony Belisle ("**Belisle**"), in the U.S. District Court for the Middle District of Florida (the "**Florida Court**") alleging fraudulent misrepresentation and negligent misrepresentation for statements made in 2017 related to Eugenia's investment for policy year 2018 (the "**Eugenia Litigation**"). Eugenia sought compensation for losses suffered as a result of its investment in the Retro Funds in 2018, and claimed US$ 7.5 million plus costs and punitive damages.

28.     In January 2021, Belisle, through counsel, filed a motion to dismiss the Eugenia Litigation.

29.     In reliance on an indemnity from the Manager pursuant to the terms of his former employment contract, Belisle demanded that the Manager meet his costs of defending the Eugenia Litigation, and the amount of any judgment, and took steps to have the Manager joined as a defendant to the Litigation although the Manager was not formally joined.

650561

30.   The Eugenia Litigation was settled on a confidential basis without admission of liability by Belisle or the Manager.  Eugenia was paid an amount in settlement of its claims which reflected an assessment of the likelihood of success of the claim and comparatively large legal costs the Manager would be likely to incur in defending the proceeding had it been joined.  The Manager claimed the amount of the settlement from its D&O insurance cover, meaning that there was no material depletion of Fund assets.

31.   Following the Eugenia Litigation, another investor in the Markel CATCo business has separately threatened to commence litigation against Belisle and/or the Manager based on similar allegations to those advanced in Eugenia Litigation, however no such litigation has yet been commenced.

32.   Against the background of the substantial losses suffered by the Funds in both 2017 and 2018, and in light of the Eugenia Litigation and the other, threatened investor litigation, the board of directors of the Company (the "**Board**") is now concerned that other investors may seek to commence claims against the Manager, Private Fund, Public Fund or Reinsurer, or other persons entitled to indemnities from such entities ("**Investor Claims**").

33.   Although it is impossible to predict every claim an investor might seek to bring, a purely hypothetical example of the type of claim an investor might seek to commence, based on the Eugenia Litigation, would be on the basis of statements or omissions made in the CATCO Group's investor communications and offering materials.

34.   Whilst the Company does not believe these Investor Claims to be valid for various reasons, if investors were to bring Investor Claims, then these claims would all be substantially similar and all investors in the relevant year to which the claims relate would likely have an equivalent claim.  Obligations that the CATCo Group and its affiliates have with respect to their operations and professional conduct are common to all investors.  If, contrary to the view of the Company, there was any actionable statement or omission in any of the disclosure documents, claims based on such statements would be available to all investors.

C.       **Consequences of Investor Claims**

35.      The boards of directors of the CATCo Group companies do not consider that any potential
         Investor Claims would succeed for a number of reasons.  For example, the Private Fund's
         and Public Fund's offering materials included disclosures around the risk factors that could
         impact an investment.  Marketing materials, including presentations, contained similar
         disclosures regarding the information provided therein, including the hypothetical nature
         of the information in those materials.  The disclosures make clear that the model
         simulations or hypotheticals contained in the presentations should not be relied on as an
         indication of the characteristics of the actual portfolio.  These are but a few of the examples
         of the substantial barriers to the Investor Claims.

36.      Furthermore, in 2018 in response to requests from certain U.S. governmental authorities,
         Markel Corporation engaged Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**") to
         undertake a thorough review of the loss reserving process for catastrophic events that
         occurred in 2017 and reserve-related disclosures that the CATCo Group made.  The
         internal review was completed in April 2019 and Skadden found no evidence that CATCo
         Group personnel acted in bad faith in exercising their business judgment in the setting of
         reserves and making related disclosures during late 2017 and early 2018.

37.      Nevertheless, if such further Investor Claims were brought, similar to the Eugenia
         Litigation, against current or former executive employees of the Manager, it is possible
         that the Manager would be required, pursuant to indemnities provided under certain of the
         employment contracts it entered into, to satisfy the likely significant costs of defending
         such claims and any judgment that was awarded.  Furthermore, in such event, the Manager
         would likely seek to claim on the indemnities provided in the Management Agreements by
         the Private Fund, the Public Fund and the Reinsurer.

38.      The Manager's D&O/E&O insurance cover potentially applicable to these claims is now
         impaired by approximately thirty-five percent, and there is no other pool of assets available
         to satisfy further Investor Claims.  Consequently, whilst the settlement of the Eugenia
         Litigation was funded from insurance proceeds, if further Investor Claims are brought there

will not be enough insurance coverage and it may be necessary to satisfy the costs of such claims, and any judgment, from the assets of the Funds.

39.     The costs of defending such Investor Claims could be significant.  The Manager believes that the indemnification costs associated with the Eugenia Litigation would have been several million dollars.  There would have been several million dollars in additional costs borne by the Manager, and through indemnification with the Private Fund and Public Fund, as the Manager responded to various discovery requests in that litigation.  Additionally, costs would multiply if litigation was pursued against more than one defendant (e.g., if a lawsuit were filed against multiple current or former employees or against current or former employees and the Manager).

40.     Further, notwithstanding the boards' view of the likelihood of success of any potential Investor Claims, there is inherently an element of risk in any litigation, particularly in jurisdictions where liability and quantum are determined by jury.

41.     The liability of the Private Fund, Public Fund or Reinsurer for such amounts pursuant to the indemnities would be an unsecured claim, and would be required to be paid prior to any return of capital to investors.  Accordingly, any such liabilities would deplete the net asset value of the SPs available to be returned to investors.

42.     The net asset value of each investor's interest in each SP is proportionate to the size of their original investment, and according to the amount of any loss suffered in respect of such year.  Accordingly, if a court were to uphold any Investor Claims and award damages by reference to the loss made on the investment, they would likely be for damages in proportion to their holdings in each SP.  If, however, some but not all investors were to commence Investor Claims, the pool of available assets could be reduced for the benefit of some but not all investors and the investors that brought such claims could attempt to place themselves in a position to receive recoveries ahead of, and at the expense of, other equity investors in the Markel CATCo business whose rights should rank *pari passu*.  This scenario would likely lead to a liquidation of the Companies in order to avoid that inequitable result.  Given that all investors in either the Private Fund or Public Fund are invested directly or indirectly in the same business, there is little justification for any

10

investor to be able to 'jump the queue' and obtain an advantage over other investors by way of litigation.

43. Finally, given the scale of the losses suffered by investors in the Funds in 2017 and 2018 (in excess of US$ 3 billion), if any substantial portion of investors were to assert Investor Claims, the potential liability of the Manager, the Private Fund, the Public Fund or the Company could easily exceed the remaining net asset value of the Funds, rendering the relevant segregated accounts – or, in the case of the Company, its general account – insolvent.

**D.    Future Distributions**

44. Section 15(2)(a) of the SAC Act (which is applicable to the Company and the Private Fund) provides that distributions to holders of shares in segregated accounts, whether by way of dividend or distribution may not be made if "*there are reasonable grounds for believing that [...] the segregated account is not, or would after the payment not be, solvent*".

45. Section 54(1)(a) of the Companies Act, applies to the Public Fund, and to the general accounts of the Company and the Private Fund, states that a company shall not declare or pay a dividend or make a distribution out of contributed surplus, if there are reasonable grounds for believing that the company is, or would after the payment, be unable to pay its liabilities as they become due.

46. In light of the above statutory provisions, whilst the boards of directors of the Company and the other Companies do not consider that the Investor Claims would succeed, further distribution of assets by the Reinsurer to the Private Fund, or of Fund assets by the Private Fund to investors, would require careful consideration of the solvency of the Company or Private Fund in light of the potential for Investor Claims (the "**Solvency Question**"), given the consequences outlined at section V.C above.

11

## VI.    PROPOSED RESTRUCTURING

### A.    The Restructuring Proposal

47.    Markel Corporation has decided to make a buy-out proposal available to investors in the
Private Fund and the Public Fund (the "**Buy-Out Transaction**", and the implementation
of the Buy-Out Transaction, the "**Restructuring**"), in order to: (i) prevent any dissipation
of Fund assets as a result of Investor Claims; (ii) provide for an early return of capital to
investors rateably in proportion to their interests in the SPs, and therefore ensure that all
investors are treated alike and none gain an unfair advantage through litigation; and (iii)
avoid the potential for Investor Claims and the consequent risk of an insolvent liquidation
of the CATCo Group entities.

48.    Under the Buy-Out Transaction, it is intended that both the Private Fund and the Public
Fund (each, a "**Scheme Company**", and together, the "**Scheme Companies**") will propose
the entry into two creditor schemes of arrangement in Bermuda, under section 99 of the
Companies Act (the "**Schemes**").   The Schemes will be conditional upon each other.
Further detail in respect of the proposed terms of the Schemes is set out at sub-section C
below.

49.    The boards of directors of the Scheme Companies believe that the Schemes would be
beneficial to all investors (who are believed to be the only material stakeholders of the
Companies), if they are to proceed, in that it will provide for an early return of capital to
investors rateably in proportion to their interests in the SPs, and prevent any dissipation of
fund assets as a result of Investor Claims.  In particular, the Schemes will avoid the risk of
an insolvent liquidation in the event that multiple Investor Claims are brought against the
Company, or other entities within the CATCo Group (with resulting indemnity claims
against the Company), in the future.  Furthermore, if approved by investors and sanctioned
by the Bermuda Court, the Schemes will resolve the Solvency Question, enabling the
Company and Private Fund to continue to run-off the Fund assets in the ordinary course.

50.    The launch of the Schemes is dependent on whether sufficient levels of investor support
are obtained.  On or about the time of filing the petition for the winding-up of the Company
– which is intended to take place simultaneously with the Private Fund, Public Fund and

12

Manager filing their own winding-up petitions – and of the application to appointment of the JPLs in respect of the same, the Manager intends to publicly announce the Buy-Out Transaction, with support from the boards of directors of the Companies.  Following the public announcement, investors in both the Private Fund and Public Fund will be given several weeks in which to provide an undertaking to support the Buy-Out Transaction and relevant Scheme, and in doing so become eligible to receive an early consent fee.  During this period, the Companies will engage with investors in the Private Fund and the Public Fund in order to obtain their support. The Companies will also consult with the JPLs in relation to the Schemes, before proceeding to launch them.

51.   Based on preliminary discussions held with investors to date, the Companies expect that investors in the Public Fund and the Company are likely to support the Buy-Out Transaction and agree to approve the Schemes.  However, if sufficient investors do not agree to support the Schemes, the Private Fund and the Public Fund will need to determine the appropriate course of action, which could include entry into full liquidations (this latter scenario is referred to as the "**Liquidation Scenario**").

52.   As described in detail in the Candiolo Affidavit, whether the scheme process is formally launched or not, the winding-up proceedings are intended to protect the CATCo Group entities from the negative impact of potential Investor Claims and therefore to preserve the amount of funds to be returned to investors.  This will be especially beneficial during the process of seeking investor support to launch the Schemes, and also during the implementation of the Schemes.  In the event that the Schemes are <u>not</u> launched, and the CATCo Group entities decide to commence ordinary, full liquidations, the CATCo Group entities will have the benefit of having provisional liquidators already in place who would be, at that point, already very familiar with the Companies' operations and finances.

53.   For the Court's reference, sub-section C below provides a summary overview of the proposed terms of the two Schemes (although it should be noted that these may be subject to change).

**B.    AlixPartners' Analysis**

13

54.    As part of preparing for the development and proposal of the Schemes, the CATCo Group retained AlixPartners UK LLP ("**AlixPartners**") at the end of May 2021 to prepare a report that analyses the outcomes to investors arising from the Schemes compared to potential scenarios arising in the absence of the Schemes.

55.    AlixPartners' report modelled two hypothetical alternative scenarios: (1) a liquidation with very limited unsuccessful loss claims brought by investors; and (2) a liquidation with some loss claims that were successful.  In each case, there were a number of downside factors that could impact investor returns whether or not the claims were successful, including: (i) the costs of the liquidation process; (ii) the legal fees associated with adjudicating any claims; and (iii) the increased creditor pool arising from any admitted claims.  The report found that the outcomes for each scenario were materially worse for investors than under the Schemes.

56.    Further detail in respect of AlixPartners work, carried out on behalf of the CATCo Group prior to Simon Appell's appointment as one of the JPLs, is set out in the Candiolo Affidavit.

**C.    The Buy-Out Transaction and the Schemes**

57.    The Schemes will seek to implement a cash buy-out of all or substantially all of the investors' shares in the Retro Funds, and an early return of value to investors in the Aquilo Fund.  Affiliates of Markel Corporation will provide funding to the Private Fund to allow an early return of capital to investors.  In consideration for the return of capital, the investors, the Companies, Markel Corporation and each of their related parties will provide mutual releases pursuant to which they will release each other from any and all claims of whatever nature arising out of the Companies' businesses and/or the investors' shares (the "**Releases**").

58.    If approved by investors and sanctioned by the Court, the Schemes will resolve the Solvency Question described above, enabling the CATCo Group to make further distributions to investors and continue to run-off the remaining Fund assets in the ordinary course.

1.    *Distribution to investors in the Retro Funds*

14

650561

59.  Certain wholly-owned subsidiaries of Markel Corporation (the "**Funding Cos**"), will provide funds (the "**Buy-Out Amount**") to the Private Fund to enable it to distribute to investors in the Retro Fund (including the Public Fund) on or shortly after the closing date (the "**Closing Date**"), each investor's proportional entitlement to:

(a)  100% of the Closing NAV of the 2016 Master Fund SP;

(b)  100% of the Closing NAV of the 2017 Master Fund SP;

(c)  90% of the Closing NAV of the 2018 Master Fund SP; and

(d)  80% of the Closing NAV of the 2019 Master Fund SP,

(together, the "**Retro Fund Accelerated Distribution**").

60.  'Closing NAV' represents current NAV adjusted for costs of the Buy-Out Transaction and a reserve for the estimated operating and other fees to run-off the Funds.

61.  In addition to the Retro Fund Accelerated Distribution, investors in the 2018 Master Fund SP and 2019 Master Fund SP will also remain entitled to their remaining portion of Closing NAV, and all investors will remain entitled to receive any upside, should NAV increase, after the return of the Buy-Out Amount to the Funding Cos.

62.  The Retro Fund Accelerated Distributions will be funded from a combination of (i) the amount of assets available for distribution to investors in a particular SP on the Closing Date as determined by the Manager in accordance with past practice, relevant bye-laws and supplemental offering memorandum, (ii) cash on hand at the relevant Retro Fund and (iii) the Buy-Out Amount to be provided by the Funding Cos.

63.  The Buy-Out Amount shall be advanced by the Funding Cos to a wholly-owned subsidiary (the "**Purchaser**") of Markel Corporation.  The Purchaser shall acquire shares in the Reinsurer from the Master Fund and the Master Fund will then use the Buy-Out Amount to make the Retro Fund Accelerated Distributions.

650561

### 2.    *Distributions to investors in the Aquilo Fund*

64.    For the Aquilo Fund, a substantial portion of the Fund assets are currently held by a rated fronting reinsurer (the "**Fronting Reinsurer**") as protection against any reserve strengthening required on certain policies.  In order to facilitate an early release of such capital, a wholly-owned subsidiary of Markel Corporation will provide an adverse development cover to the Fronting Reinsurer that will enable the release of $100 million to the Private Fund, which will be returned to investors in the Aquilo Fund less an allocation of the costs of the Buy-Out Transaction and a reserve on account of the likely costs to run-off the remainder of the Aquilo Fund assets.

### 3.    *Distributions to investors in the Public Fund*

65.    The Public Fund is an investor in the Master Fund, and will receive its Retro Fund Accelerated Distribution in accordance with the Private Fund Scheme.  The Public Fund has issued two classes of shares: Ordinary Shares and C Shares.  Further detail in respect of the shareholding structure in the Public Fund is set out in the Candiolo Affidavit.

66.    The amounts received by the Public Fund will be distributed to holders of Ordinary Shares and C Shares in accordance with their proportionate entitlements and in accordance with the Public Fund Bye-Laws.

### 4.    *The Releases*

67.    The Schemes will provide that investors, the Companies, Markel Corporation and their related parties and affiliates grant the Releases.  Pursuant to the Schemes all investors will release any potential Investor Claims against the Company, the Scheme Companies, the JPLs, the Manager, Markel Corporation, the advisors to the Companies and the JPLs and the various other parties entitled to an indemnity under the Management Agreements.

## VII.    RESOLUTION TO COMMENCE WINDING-UP PROCEEDINGS

68.    The directors of the Company have the power under the Company's bye-laws to "*present any petition and make any application in connection with the liquidation or reorganisation of* [the] *Company*".

69.    In order to facilitate the implementation of the Restructuring, between 9 to 17 September 2021, the boards of directors of each of the Company, the Scheme Companies and the Manager, pursuant to their powers under the respective bye-laws, unanimously approved a written resolution to:

(a)    commence winding-up proceedings by the presentation of a petition to the Supreme Court under the provisions of the Companies Act, section 161(a); and

(b)    seek the appointment of Simon Appell of AlixPartners UK LLP and John C. McKenna of Finance & Risk Services Ltd. as joint provisional liquidators (the "**JPLs**") to monitor the implementation of the Schemes, with, in the first instance, powers of oversight, leaving the existing boards of directors of each of the Companies responsible for the Restructuring.

70.    The Manager, as the sole shareholder of the Company, has also passed a written resolution to wind the Company up under section 161(a) of the Companies Act.

71.    It is anticipated that on the first return date of this Petition an application will be made for an adjournment to allow time for the Companies to obtain investor support for the launch of the Schemes and the Restructuring.  In the event that the requisite levels of investor support are <u>not</u> obtained, and the Board determines not to proceed with the launch of the Scheme, it is anticipated that the Board will then determine whether the Company should enter into full liquidation and therefore seek to continue with the Petition.

72.    The terms of the orders sought for the appointment of the JPLs provide for, *inter alia*, the continuation of the current management of the Companies during this process, with the JPLs monitoring the activities of the existing boards of directors of each the Company, Public Fund, Manager and Reinsurer entities in promoting the Restructuring and the

17

Schemes and, in that capacity, reporting to this Court if it appears that the Restructuring may be no longer in the interests of creditors and investors (in which case, the Companies may proceed to enter into the Liquidation Scenario).

**YOUR PETITIONER THEREFORE HUMBLY PRAYS AS FOLLOWS**:

1.    That the Company be wound up by order of the Court under the provisions of the Companies Act and the SAC Act;

2.    That Simon Appell of AlixPartners UK LLP and John C. McKenna of Finance & Risk Services Ltd. be appointed as joint provisional liquidators of the Company;

3.    That such other order may be made in the premises as shall be just; and

4.    That the costs of and occasioned by this Petition be paid out of the assets of the Company.

Dated this 27th day of September 2021

ASW LAW LIMITED
Crawford House
50 Cedar Avenue
Hamilton HM 11
Attorneys for the Petitioner

**NOTE:** It is intended to serve this petition on the Registrar of Companies and the Bermuda Monetary Authority.

It is ordered that this Petition shall be heard before the court sitting on the          day of          at          o'clock in the          -noon.

Dated this          day of          2021

_____

REGISTRAR

650561

18

**IN THE SUPREME COURT OF BERMUDA**
**COMMERCIAL COURT**
**COMPANIES (WINDING UP)**
**2021: No.**

**IN THE MATTER OF MARKEL CATCO RE LTD.**
**AND IN THE MATTER OF THE COMPANIES ACT 1981**
**AND IN THE MATTER OF THE INSURANCE ACT 1978**
**AND IN THE MATTER OF THE SEGREGATED**
**ACCOUNTS COMPANIES ACT 2000**

---

**PETITION**

---





ASW Law Limited · Crawford House
50 Cedar Avenue · Hamilton, HM11
BERMUDA

Attorneys to the Petitioner

KALG-7363-005



650561