**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 15 |
| MARKEL CATCO REINSURANCE FUND LTD., *et al.*, | Case No. 21-11733 (LGB) |
| Debtors in Foreign Proceedings.[1] | (Joint Administration Requested) |

## DECLARATION OF SIMON APPELL IN SUPPORT OF THE VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVES, AND (III) CERTAIN RELATED RELIEF

Pursuant to 28 U.S.C. § 1746, I, Simon Appell, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration (this "**Declaration**"). I am making this Declaration in accordance with section 1515 of title 11 of the United States Code (the "**Bankruptcy Code**") and rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

2.      I am one of two joint provisional liquidators of the above-captioned foreign debtors (collectively, the "**Debtors**"). The Debtors are "affiliates" as such term is defined in Bankruptcy Code section 101(2) and as used in Bankruptcy Rule 1015(b). The other joint provisional liquidator of the Debtors is John C. McKenna of Finance & Risk Services Ltd. (a "**JPL**" and together, with myself, the "**JPLs**").

---

[1]    The Debtors are Bermuda companies registered with the Registrar of Companies in Bermuda. The Debtors' respective registration numbers are as follows: Markel CATCo Reinsurance Fund Ltd. (50599); CATCo Reinsurance Opportunities Fund Ltd. (44855); Markel CATCo Investment Management Ltd. (50576); Markel CATCo Re Ltd. (50602). Each of the Debtors has its registered office located at Crawford House, 50 Cedar Avenue, Hamilton HM11, Bermuda.

3.      I am a Managing Director of AlixPartners UK LLP ("**AlixPartners**"). I have been a member of the Institute of Chartered Accountants in England and Wales since 1988. I have been a licensed insolvency practitioner in the United Kingdom since 2004. I am also an accredited mediator. I have more than 30 years' experience in corporate reconstruction, insolvency, and the investigation of complex financial transactions, in Europe, the United States, Asia, the Cayman Islands, and Bermuda.

4.      On October 1, 2021, Mr. McKenna and I were appointed JPLs in the Debtors' liquidation proceedings under Part XIII of the Companies Act 1981 (as amended, the "**Bermuda Companies Act**"), pending before the Supreme Court of Bermuda (the "**Bermuda Court**"), Companies (Winding Up) Commercial Court (the "**Provisional Liquidation Proceedings**"). Copies of the orders evidencing the appointment of the JPLs (the "**JPL Appointment Orders**") are attached to each Debtor's official form petition filed concurrently herewith (collectively, the "**Chapter 15 Petitions**") as Exhibit B thereto.

5.      As reflected in the Verified Petition (defined below), Debtors CATCo Reinsurance Opportunities Fund Ltd. (the "**Public Fund**") and Markel CATCo Reinsurance Fund Ltd. (the "**Private Fund**") contemplate filing subsequent applications for the sanctioning of schemes of arrangement under section 99 of the Bermuda Companies Act (the "**Schemes**") before the Bermuda Court (the "**Scheme Proceedings**," and together with the Provisional Liquidation Proceedings, the "**Bermuda Proceedings**"). The Verified Petition seeks recognition of the Bermuda Proceedings under chapter 15 of the Bankruptcy Code.

6.      The JPL Appointment Orders appointed Mr. McKenna and me as the Debtors' duly authorized "foreign representatives" (as that term is defined in the Bankruptcy Code) (in such capacity, the "**Foreign Representatives**") and authorized us to, among other things, act as the

Debtors' agents and representatives in such other jurisdictions as we deem necessary or appropriate in furtherance and support of the Restructuring (as defined below) to be implemented by the Bermuda Proceedings, including proceedings under chapter 15 of the Bankruptcy Code. *See* JPL Appointment Orders ¶¶ 2 & 3(j).

7.       I submit this Declaration in support of (a) the Chapter 15 Petitions for each of the Debtors; (b) the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representatives, and (III) Certain Related Relief* (the "**Verified Petition**");[2] (c) the *Motion for Entry of an Order (I) Scheduling Recognition Hearing and (II) Specifying Form and Manner of Service of Notice of the Notice Documents and Other Documents Filed in the Chapter 15 Cases* (the "**Scheduling Motion**"), and (d) the *Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 15 Cases and (II) Authorizing the Foreign Representatives to File Consolidated Lists of Information* (the "**Joint Administration Motion**"), each filed contemporaneously herewith.

8.       Consistent with my role as a JPL, I have gained knowledge of the Debtors' history, day-to-day operations, assets, financial condition, business affairs, and books and records. I am over the age of 18 and, except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge; (b) my review of relevant documents, including documents prepared or filed in connection with the Bermuda Proceedings and the above-captioned chapter 15 cases (the "**Chapter 15 Cases**"); (c) information supplied to me by the officers, directors, employees, or professionals retained by the Debtors; or (d) my experience and knowledge of the Debtors' assets and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition.

## BACKGROUND

### I.    The Debtors' Business

9.    **Background.** The Debtors are each incorporated in Bermuda and collectively comprise an investment fund business that provided investors the opportunity to invest in catastrophic risk reinsurance. In 2015, Markel Corporation, an entity incorporated in Virginia, ("**Markel Corporation**"), acquired the insurance-linked securities business operated by CATCo Investment Management Limited, a Bermuda incorporated company. As a result of this acquisition, Debtor Markel CATCo Investment Management Ltd. (the "**Manager**") was incorporated in order to take over the role of CATCo Investment Management Limited and to manage the investments of the Public Fund and of the then-newly established Private Fund.[3]

10.    **Corporate Information Regarding the Debtors.**

(a)    **The Manager.** The Manager is a company incorporated in Bermuda under the Bermuda Companies Act on September 2, 2015. The Manager holds an investment business license issued by the Bermuda Monetary Authority (the "**BMA**") under the Bermuda Investment Business Act 2003 and an insurance management license issued by the BMA under the Bermuda Insurance Act 1978 and its related regulations (the "**Bermuda Insurance Act**"). The Manager is an indirect, wholly owned subsidiary of Markel Corporation, and owns 100% of the voting shares of each of the Private Fund and the Reinsurer (as defined below).

(b)    **The Private Fund.** The Private Fund is a mutual fund company incorporated in Bermuda under the Bermuda Companies Act on September 14, 2015, and registered as a segregated accounts company under the Bermuda Segregated Accounts Companies

---

[3]    Paragraphs 9 and 11 through 36 in this Background and corresponding sections in the Verified Petition are my understanding of the facts based on discussions with the Debtors' management.

Act 2000, as amended (the "**Bermuda SAC Act**"), on November 9, 2015. The Private Fund is authorized by the BMA as an "Institutional Fund" under the Bermuda Investment Funds Act 2006.

(c)     **The Public Fund.** The Public Fund is a mutual fund company incorporated in Bermuda under the Bermuda Companies Act on November 30, 2010. The Public Fund is publicly listed on the London Stock Exchange (Specialist Fund Segment) and the Bermuda Stock Exchange (the "**BSX**").

(d)     **The Reinsurer.** Debtor Markel CATCo Re Ltd. (the "**Reinsurer**") is a reinsurance company incorporated under the Bermuda Companies Act on September 14, 2015, and registered as a segregated accounts company under the Bermuda SAC Act. The Reinsurer is registered with the BMA as a Class 3 Insurer under the Bermuda Insurance Act.[4]

11.    **Business Overview.** From 2015 to 2019, the Manager managed a reinsurance and retrocessional (or "**retro**")[5] reinsurance business known as "**Markel CATCo**," through which capital raised from investors was invested in reinsurance products in accordance with its offering documents. The Manager, the Private Fund, the Public Fund, and the Reinsurer are collectively referred to herein as the "**CATCo Group**."

12.    As part of the Markel CATCo business, the Reinsurer provided catastrophic risk reinsurance and retro reinsurance to its clients, covering extraordinary losses incurred in respect of certain regions and certain natural disasters within a defined time period, usually a calendar year. The Reinsurer was funded by the Private Fund with private investor capital raised directly by the Private Fund, and raised indirectly by the Public Fund on the Specialist Fund Segment of

---

[4]    Under the BMA insurance licensing system, Class 3 licensees include structured reinsurers writing third-party business; insurers writing direct policies with third-party individuals; and single-parent, group, association, agency or joint venture captives where more than 20 percent of net premiums written is from risks that are unrelated to the business of the owners.

[5]    Retrocessional reinsurance is reinsurance for a reinsurer.

the London Stock Exchange (with a secondary listing on the BSX). The reinsurance policies issued

by the Reinsurer were fully collateralized, meaning that the Reinsurer held or holds liquid assets

in a separate trust account for each reinsurance contract equivalent to the full potential liability

under the contract. The collateral comprised the premium paid by the reinsurance clients, plus an

allocation of the proceeds of investments from the Private Fund and, indirectly, the Public Fund.

13.     In summary, capital was raised by soliciting investments in the Private Fund and

the Public Fund, with such investor capital ultimately invested in the Reinsurer by way of

individual funds operated by the Private Fund subscribing for shares in the Reinsurer. Each class

of shares issued by the Reinsurer was linked to specific reinsurance products. During 2015 to 2019,

the funds received over \$4.3 billion in subscriptions from third-party investors.

14.     **Structure of Investments.** In respect of the structure of investments in the Markel

CATCo business, private investors would invest directly through segregated accounts of the

Private Fund and public and institutional investors invested in the Public Fund, which in turn

invested directly in the Private Fund. In essence, therefore, the Public Fund operated as a "feeder

fund," through which public and institutional investors were able to invest indirectly in the Private

Fund. The Private Fund operated eight segregated accounts, or funds.[6] Each fund was open to

specific investors, with those investing directly into the Private Fund receiving shares in a

particular segregated account. Six of these accounts (referred to as the "**Sub-Funds**") in turn

invested investor funds into an account known as the "**Master Fund**"; the Master Fund in turn

invested predominantly in retro reinsurance products issued by the Reinsurer (the Master Fund and

---

[6]     Specifically, the Private Fund operates eight funds: (i) Markel CATCo Diversified Fund (the "**Master Fund**");
(ii) Diversified Fund II; (iii) Limited Diversified Arbitrage Fund; (iv) Diversified Arbitrage Fund; (v) GTL
Diversified Fund; (vi) Markel Diversified Fund; (vii) QIC Diversified Fund; and (viii) Aquilo Fund (collectively,
the "**Funds**," and each, a "**Fund**"). The Funds are segregated accounts of the Private Fund, meaning that each
Fund is a separate individually managed pool of assets with its own investment objective and policies.

Sub-Funds are referred to collectively herein as the "**Retro Funds**" for this reason). The Public Fund invested directly in the Master Fund account. The Master Fund was therefore the account into which all investor capital, other than that invested in the remaining account operated by the Private Fund, namely, the "**Aquilo Fund**," was pooled and subsequently deployed as investment in the Reinsurer. The Aquilo Fund offered investors exposure to non-retrocessional insurance products issued by the Reinsurer.

15.    **Reinsurance Operations.** The Reinsurer wrote two types of insurance business: (a) retro coverage for reinsurers ("**cedants**")[7] in respect of the Retro Funds and (b) ordinary reinsurance for insurers in respect of the Aquilo Fund. Each retro policy written by the Reinsurer is held within a separate segregated account, 100% of the share capital of which is owned by the Master Fund. Each reinsurance policy line signed by the Reinsurer is held within the Aquilo segregated account of the Reinsurer, 100% of the share capital of which is owned by the Aquilo Fund. Investors' capital is held as cash and cash equivalent assets in a trust account held in New York for the benefit of the relevant cedant (each a "**Trust Account**").

16.    When loss events occur during the policy year, the Manager uses its judgment to set loss reserves that it believes will be sufficient to cover claims under the relevant policies. The total liability in respect of any policy is not typically known at the end of the policy year, as additional claims are made to the underlying insurer, and reinsurer, in periods after the policy year. Accordingly, following the expiry of the policy year, cedants can "trap" assets in the Trust Accounts to cover their ultimate exposure. As the total claims becomes more certain, and as claims are settled, the amount reserved may be reduced or increased. The net asset value ("**NAV**"), from

---

[7]    A "cedant" is a company that purchases a reinsurance policy from a reinsurer.

time to time, of any policy is the amount by which the amount trapped exceeds the loss reserves under the policy.

17. **Management Operations.** The Manager is responsible for the day-to-day management of the Private Fund and the Reinsurer, and for providing certain management services to the Public Fund. The Manager provides such management services to the Private Fund, the Public Fund, and the Reinsurer pursuant to the terms of certain management agreements with such entities (the "**Management Agreements**"). Among other things, under their respective Management Agreements, each of the Private Fund, the Public Fund, and the Reinsurer have provided broad indemnities to the Manager, its affiliates, and others in respect of, in summary, claims arising out of the performance by the Manager, and its officers, directors, employees, and affiliates, of their respective duties under the Management Agreements, other than claims for negligence, gross and/or willful negligence, willful default, fraud and dishonesty (depending on the particular wording used in each Management Agreement).

18. **Corporate and Fund Structure.** The corporate and fund structure of the CATCo Group is set out below. Note that the following diagram is simplified; there are more segregated accounts than those depicted here for illustration purposes.



II.      **Overview of the Debtors**

A.      **Location of the Debtors' Domicile, Registered Office, and Headquarters**

19.      **Incorporated in Bermuda.** Each of the Debtors is incorporated in Bermuda. They have each carried on their business in Bermuda since their incorporation and continue to exist in accordance with the laws of Bermuda.

20.      **Registered Office and Headquarters in Bermuda**. Each of the Debtors has its registered office located at Crawford House, 50 Cedar Avenue, Hamilton, HM11, Bermuda. I have been advised that under Bermuda law, the situs of shares in a company is at the registered office of the company at which the register of members should be kept, which in the case of each of the Debtors is Bermuda.

21.      The physical location of the Debtors' corporate headquarters is at 8th Floor East, 141 Front Street, Hamilton HM19, Bermuda. The Debtors maintain offices in no other locations.

B.      **Location of the Debtors' Management**

22.      **Management in Bermuda**. The Debtors' central administration, management, and control takes place in Bermuda, and all key management decisions are generally made there, although certain decisions may be made telephonically from time to time.

23.      **One of the JPLs in Bermuda.** In addition, Mr. McKenna, who resides in Bermuda, and I have been monitoring the Debtors' affairs following our appointment as JPLs pursuant to the JPL Appointment Orders. Our role during such appointment includes, but is not limited to, evaluating and providing critical input on the proposed restructuring and supporting filings and applications to the Bermuda Court.

24.      The JPL Appointment Orders also identify Mr. McKenna and me as the properly and validly appointed "foreign representatives" of the Debtors, who are authorized to, among other things, represent the Debtors and act as the Debtors' agent in seeking any relief available to a

"foreign representative" under chapter 15 of the Bankruptcy Code, including commencing the Chapter 15 Cases and otherwise seeking the assistance from the U.S. bankruptcy courts, including recognition and enforcement under the provisions of the U.S. Bankruptcy Code of any order entered by the Bermuda Court in relation to the Restructuring. *See* JPL Appointment Orders ¶ 3(j).[8]

25.    **Board Meetings in Bermuda**. Board meetings of the Debtors are typically held telephonically, but a majority of the Debtors' board members reside in Bermuda. In particular, the locations of the board members are set forth below:

---

[8]    The JPL Appointment Orders provide:

> that the JPLs be appointed as the duly authorised "foreign representatives," as that term is defined in the U.S. Bankruptcy Code, of the Company and be authorised to seek relief under chapter 15 of the U.S. Bankruptcy Code and to take such steps arising in connection therewith as the JPLs may consider appropriate.

JPL Appointment Orders ¶ 2. The powers of the JPLs under the JPL Appointment Orders include, among other things,

> to act as the Company's agent and representative in proceedings in such other jurisdictions as the JPLs deem necessary or appropriate in furtherance and support of the Restructuring Proposal, including proceedings under chapter 15 of the U.S. Bankruptcy Code . . .; to seek any relief available to a "foreign representative" under chapter 15 of the U.S. Bankruptcy Code, including commencing the Chapter 15 Cases, filing petitions and any other documents, motions, affidavits, or similar documents, and otherwise seeking assistance from the U.S. Bankruptcy Courts, including recognition and enforcement under the provisions of the U.S. Bankruptcy Code of any order entered by this court in relation to the Restructuring Proposal; and to take such other action in the United States of America or elsewhere as deemed necessary or appropriate in furtherance and support of the Restructuring Proposal.

JPL Appointment Orders ¶ 3(j).

| Debtor | Director | Country of Residence |
|---|---|---|
| The Manager | Michael Toyer | Bermuda |
| | Andrew Barnard | Bermuda |
| | Jed Rhoads | Bermuda |
| The Reinsurer | Michael Toyer | Bermuda |
| | Federico Candiolo | Bermuda |
| | Jed Rhoads | Bermuda |
| | Andrew Barnard | Bermuda |
| The Private Fund | Michael Toyer | Bermuda |
| | Alastair Barbour | United Kingdom |
| | Robert Vrolyk | United States |
| The Public Fund | James Keyes | Bermuda |
| | Arthur Jones | Bermuda |
| | Margaret Gadow | United Kingdom |

C.    **Location of the Debtors' Primary Assets**

26.    The primary assets of the Public Fund, the Private Fund, and the Reinsurer include amounts held in bank accounts held with HSBC in Bermuda. Further, the Debtors maintain the majority of their bank accounts in Bermuda. The Manager's primary assets include 100% of the voting stock of the Reinsurer and the Private Fund. The other Debtors also directly or indirectly hold shares in the Reinsurer.

D.    **Presence in Bermuda Marketplace**

27.    The Debtors have a significant presence in the Bermuda marketplace, including, but not limited, through their registration and licensing with the BMA and the Public Fund's listing on the BSX. General meetings of the Public Fund are also held in Bermuda, but most shareholders vote by proxy rather than in person.[9]

---

[9]    The Private Fund conducts its meetings and governance affairs via written resolutions and do not hold in-person meetings.

**III.    Events Leading to the Chapter 15 Cases**

      **A.    Business Losses and Run-Off**

28.    **Losses in 2017 and 2018.** In 2017 and 2018, the catastrophic risk reinsurance business of the CATCo Group was hit by historically large losses due to a number of large windstorms and forest fires. Consequently, investors in the Markel CATCo business suffered material losses on their investments.

29.    **Run-Off.** Following a second year of losses in 2018, the Manager extended a special redemption option to investors of the Public Fund and the Private Fund and, in view of the majority uptake, decided to cease offering new investment in the Funds. Accordingly, at the end of the 2019 policy year, all remaining capital in the Funds, other than that trapped as collateral for insurance policies, was returned to investors.

30.    Subsequently, on March 26, 2019, investors in the Public Fund voted to approve the orderly run-off of its investments in the Master Fund operated by the Private Fund. On July 25, 2019, the Manager announced that the Private Fund would cease accepting new investments and would not write any new business going forward through the Reinsurer. Following the Manager's announcement in July 2019, the Manager commenced the orderly run-off of the Reinsurer's existing portfolio.

31.    The Manager has since continued to manage the retro and reinsurance portfolios, in order to run-off the policies in an orderly manner and, subject to approval from the BMA, return capital to investors as it is released from the Trust Accounts to the Reinsurer. The run-off has progressed smoothly since the Funds stopped accepting new subscriptions, with a total of approximately $2.3 billion released and returned to investors as of August 2021. The Manager expects the run-off to be completed by January 2023.

### B.    Investor Litigation

32.    In another relatively recent and highly significant development, prior to the public announcement of the Buy-Out Transaction (as defined below), two small investors in sub-funds operated by the Private Fund asserted and threatened claims, respectively, seeking to recover losses incurred on their investments in 2017 and 2018 (as described further below). A third investor has also recently threatened similar claims. Namely, in October 2020, one of these investors filed a claim in the United States against the former chief executive officer of the Manager, Anthony Belisle. In June 2021, a settlement was reached with respect to this claim.

33.    Although the Manager was ultimately not named in this litigation, due to the indemnification obligations asserted by Mr. Belisle against the Manager as a former employee, the Manager facilitated the settlement from available insurance coverage after it and the Private Fund determined that it would be in the best interests of all investors to avoid what might become significant litigation defense costs that could exceed the claimed damages and have a detrimental impact on investor returns. The other investors have threatened, although not formally commenced, similar claims, and while the Manager and Private Fund think these claims are unfounded, they remain unresolved.

34.    As publicly disclosed, late in the fourth quarter of 2018, Markel Corporation received inquiries from the U.S. Department of Justice (the "**DOJ**"), the U.S. Securities and Exchange Commission (the "**SEC**"), and the BMA into loss reserves recorded in late 2017 and early 2018 at the Reinsurer. Notably, in response to these requests, Markel Corporation engaged Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**") to undertake a thorough review of the loss reserving process for catastrophic events that occurred in 2017 and reserve-related disclosures that the CATCo Group made. Without waiving any privilege attaching to the internal review, the Debtors note that such review was completed in April 2019 and Skadden found no evidence that

14

CATCo Group personnel acted in bad faith in exercising their business judgment in the setting of reserves and making related disclosures during late 2017 and early 2018. This supports the Debtors' conclusion that any potential investor claims, brought on the basis of the CATCo Group's loss reserving process, would not be meritorious.

35.    While the Manager strenuously denies any liability with respect to these claims, and the Debtors do not believe that such claims would ultimately be meritorious, there is a risk that other investors could seek to assert "copycat" claims against the Manager or persons who are entitled to indemnification from the Manager (such as its officers, directors, or employees). In the event such further investor claims were to be asserted, the Manager would incur significant defense costs, along with any costs of settlements or payments of adverse judgments, resulting from such claims against the Manager or its officers, directors, or employees, and the Manager would be entitled to indemnification from the Public Fund, the Private Fund, and the Reinsurer of such costs and payments.

36.    Importantly, under Bermuda law, such investor claims (if successful) may, and associated indemnification obligations will, legally rank ahead of, and have priority of payment over, the interests of investors due to the investors holding equity interests. This could result in an inequitable distribution of fund assets, as investors who have asserted claims could be paid ahead of all other investors. Any claim and indemnification payments in excess of the limited available insurance coverage will directly decrease assets of all funds that would otherwise be available for distribution to all investors. Furthermore, the costs associated with such claims (if they were to be asserted), whether or not they are ultimately meritorious, would materially impair the ability of the Debtors to continue to return capital to investors as it becomes available for distribution.

Consequently, any further distributions to investors are unlikely to be made until the risk of future investor claims being asserted against the CATCo Group is resolved.

IV.      **The Buy-Out Transaction and the Bermuda Proceedings**

      A.      **The Buy-Out Transaction**

37.      In order to: (a) resolve the uncertainty around further investor litigation; (b) ensure that all investors are treated alike, and none gain an unfair advantage through litigation; and (c) facilitate the expeditious return of funds to investors, Markel Corporation has decided to make a buy-out transaction available to the Private Fund and the Public Fund (the "**Buy-Out Transaction**" and the implementation of such Buy-Out Transaction, the "**Restructuring**").

38.      Under the Buy-Out Transaction, it is intended that the Schemes will be proposed by each of the Private Fund and the Public Fund (together, the "**Scheme Companies**") in the near future to implement the Buy-Out Transaction, pursuant to which investors in the Private Fund and the Public Fund will receive an early return of all or substantially all of their remaining capital invested in the Private Fund and the Public Fund, as well as being entitled to any future upside on their investments. In exchange, investors will provide a release of any potential claims against the Debtors and related entities and individuals. Markel Corporation will provide funding to facilitate the Buy-Out Transaction and bear substantially all the down-side risk from any future reserve strengthening at the Reinsurer.

39.      On September 27, 2021, the Debtors filed the Provisional Liquidation Proceedings and the Manager publicly announced the Buy-Out Transaction to be proposed under the two Schemes. Following the public announcement of the Buy-Out Transaction, investors in both the Private Fund and the Public Fund are being given several weeks in which to provide an undertaking to support the Buy-Out Transaction and relevant Scheme, and in doing so become eligible to receive an early consent fee. During this period, the Debtors will engage with investors in the

Public Fund and the Private Fund to obtain their support. The Debtors will also consult with the

JPLs in relation to the Schemes, before proceeding to launch them.

40.     Based on preliminary discussions held with investors to date, the Debtors expect

that investors in the Public Fund and the Private Fund are likely to support the Buy-Out Transaction

and agree to approve the Schemes. However, if sufficient investors do not agree to support the

Schemes, the Private Fund and the Public Fund will need to determine the appropriate course of

action, which could include proceeding to enter into full liquidation.

41.     Accordingly, the purpose of the Debtors commencing the Provisional Liquidation

Proceedings is, in short, to provide a stable platform for them to carry out the Restructuring.

Importantly, the appointment of the JPLs will provide protection for each Debtor and its assets

from the claims of unsecured creditors, including litigation claimants, by imposing an automatic

stay on all actions in Bermuda during the pendency of the Provisional Liquidation Proceedings in

order to facilitate implementation of the Restructuring. The purpose of the Bermuda Proceedings

is an orderly distribution of the Debtors' assets to the creditors and members through the

Restructuring to be effectuated by the Schemes.

### B.     The Bermuda Proceedings

42.     **The Provisional Liquidation Proceedings.** On September 27, 2021, the Debtors

commenced (a) the Provisional Liquidation Proceedings by filing winding-up petitions, true and

correct copies of which are attached as Exhibits A-1 to A-4 to the George Declaration (the

"**Winding-Up Petitions**"), with the Bermuda Court and making applications seeking the

appointment of the JPLs as joint and several provisional liquidators of the Debtors with limited

"light-touch" powers. The Debtors' local counsel in Bermuda has informed me that the

appointment of a provisional liquidator or the making of a winding-up order brings into effect an

automatic statutory stay of actions and proceedings against the Debtors in Bermuda during the

pendency of the Provisional Liquidation Proceedings, with the effect that actions may not be commenced or continued against the Debtors without leave of the Bermuda Court and subject to such terms as the Bermuda Court may impose.

43.     On October 1, 2021, the Bermuda Court made the JPL Appointment Orders appointing Mr. McKenna and me as the JPLs. The JPL Appointment Orders mandated that the JPLs are to, among other things, monitor, consult with, and oversee the Debtors' existing boards of directors. As such, while the Debtors' existing boards of directors remain in place, the JPLs will provide a supervisory role and in that capacity ensure that stakeholders' interests are considered. The JPL Appointment Orders also appointed the JPLs as the Debtors' foreign representatives and authorized them to seek recognition of the Bermuda Proceedings under chapter 15 of the Bankruptcy Code. JPL Appointment Orders ¶ 2.

44.     **The Scheme Proceedings.** The Debtors intend to commence the Scheme Proceedings to implement the Buy-Out Transaction in the near term.

## THE CHAPTER 15 CASES

45.     As detailed in the Verified Petition, Mr. McKenna and I have commenced ancillary proceedings for the Debtors under chapter 15 of the Bankruptcy Code to obtain recognition of the Bermuda Proceedings and, ultimately, expect to seek certain related relief, including subsequent enforcement of the proposed Schemes in the United States. Mr. McKenna and I believe that the Chapter 15 Cases will complement the Debtors' primary proceedings in Bermuda to ensure the effective and economic administration of the proposed Restructuring and prevent adverse actions in the United States.

## I.     The Debtors Are Eligible "Debtors" Under Chapter 15 of the Bankruptcy Code.

46.     Mr. McKenna and I have been informed by the Debtors' legal counsel that, for the purposes of a case under chapter 15, a "debtor" means an entity that is the subject of a foreign

proceeding. Each Debtor is incorporated under the laws of Bermuda. As set forth below and in the

George Declaration, I believe the Bermuda Proceedings are foreign proceedings as that term is

defined in the Bankruptcy Code.

47.     Moreover, we understand from the Debtors' legal counsel that, the Second Circuit

interprets Bankruptcy Code section 109(a) such that only a person that resides or has domicile, a

place of business, *or has property* in the United States, or a municipality, may be a debtor under

chapter 15. Each of the Debtors has property in the United States. Specifically, the Reinsurer is

party to multiple trust agreements with The Bank of New York Mellon as grantor (the

"**Reinsurance Trust Agreements**"). Certain of the Reinsurance Trust Agreements are governed

by New York law, pursuant to which funds are held in the Trust Accounts in New York. The

Debtors each also have an interest in certain funds deposited with Skadden as a retainer for its

services in connection with the Chapter 15 Cases, which funds are held in a client trust account in

New York. Accordingly, Mr. McKenna and I believe that the Debtors are eligible "debtors" under

chapter 15 of the Bankruptcy Code. *See* ¶ 15.

## II.     The JPLs are "Foreign Representatives."

48.     Mr. McKenna and I have been informed by the Debtors' legal advisors that a

chapter 15 proceeding is commenced by the filing of a petition for recognition (and related

documents) by the "foreign representative." We are further informed that under Bankruptcy Code

section 1516(a), a bankruptcy court may presume that the person petitioning for chapter 15

recognition is a foreign representative if the decision or certificate from the foreign court so

indicates. We understand that "foreign representative" is defined in Bankruptcy Code section

101(24) to mean:

> a person or body, including a person or body appointed on an interim basis,
> authorized in a foreign proceeding to administer the reorganization or the

> liquidation of the debtor's assets or affairs or to act as a representative of such
> foreign proceeding.

11 U.S.C. § 101(24).

49.     Mr. McKenna and I were appointed by the Bermuda Court as joint provisional liquidators of the Debtors and have been authorized by the Bermuda Court to, among other things, seek recognition under chapter 15 of the Bankruptcy Code. In particular, pursuant to the JPL Appointment Orders, we were appointed by the Bermuda Court as joint provisional liquidators of the Debtors and we have been authorized by the Bermuda Court to, among other things, seek any relief available to a "foreign representative" under chapter 15 of the Bankruptcy Code, including commencing the Chapter 15 Cases, filing petitions and any other documents, motions, affidavits, or similar documents, and otherwise seeking assistance from the U.S. bankruptcy courts, including recognition and enforcement under the provisions of the Bankruptcy Code of any order entered by the Bermuda Court in relation to the Restructuring; and to take such other action in the United States of America or elsewhere as deemed necessary or appropriate in furtherance and support of the Restructuring. JPL Appointment Orders ¶ 3(j).

50.     In light of the statutory presumption embodied in Bankruptcy Code section 1516(a) noted above, the Bankruptcy Code's definition of "foreign representative" and the express provisions of the JPL Appointment Orders, I believe that Mr. McKenna and I are foreign representatives of the Bermuda Proceedings.

**III.    The Chapter 15 Petitions Are Foreign Proceedings.**

51.     I am informed by the Debtors' legal advisors that "foreign proceeding" is defined in Bankruptcy Code section 101(23) to mean:

> a collective judicial or administrative proceeding in a foreign country, including an
> interim proceeding, under a law relating to insolvency or adjustment of debt in
> which proceeding the assets and affairs of the debtor are subject to control or
> supervision by a foreign court, for the purpose of reorganization or liquidation.

20

11 U.S.C. § 101(23).

52.    I believe that both the Provisional Liquidation Proceedings and the Scheme Proceedings fall within the foregoing definition. As more fully explained in the George Declaration filed contemporaneously herewith, I am advised that the Bermuda Proceedings are, among other things, (a) collective judicial and/or administrative proceedings, (b) in Bermuda, and (c) governed by the Bermuda statute applicable to insolvencies and debt restructurings, the Bermuda Companies Act. *See generally* George Decl. ¶¶ 56–68. In the Bermuda Proceedings, the Debtors' assets and affairs are or will be subject to the control or supervision of the Bermuda Court. The JPLs' powers are also subject to the control and supervision of the Bermuda Court. *See* George Decl. ¶ 67.

## IV.    The Bermuda Proceedings Are Foreign Main Proceedings.

53.    I am also informed by the Debtors' legal advisors that Bankruptcy Code section 1517(b)(1) provides that a foreign proceeding shall be recognized as a "foreign main proceeding," as such term is defined in Bankruptcy Code section 1502(4), if the foreign proceeding is pending in the country where the debtor has its "center of its main interests" ("**COMI**"). I am informed by the Debtors' legal counsel that COMI is not defined in chapter 15, but Bankruptcy Code section 1516(c) provides that "[i]n the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1517(c). Additionally, factors I understand are relevant in identifying a debtor's COMI, none of which on their own are determinative, include (a) the location of a debtor's headquarters; (b) the location of those persons or entities that actually manage a debtor; and (c) the location of a debtor's primary assets.

54.    Each of the Debtors is incorporated in Bermuda. Moreover, each of the Debtors has its registered office located at Crawford House, 50 Cedar Avenue, Hamilton, HM11, Bermuda.

Thus, I believe that, based on its place of incorporation and location of its registered office, the

COMI of each of the Debtors is Bermuda.

55.      As explained above, additional factors supporting COMI in Bermuda for each of

the Debtors include:

(a)      **Headquarters.** The physical location of the Debtors' headquarters is also in Bermuda. The Debtors maintain offices in no other locations.

(b)      **Location of Those Who Manage the Debtors.** The Debtors' central administration, management, and control takes place in Bermuda, and all key management decisions are generally made there. *See* ¶ 22. Further, board meetings of the Debtors are typically held telephonically but a majority of the Debtors' board members reside in Bermuda. Mr. McKenna, who resides in Bermuda, and I have monitored the Debtors' affairs since our appointment as JPLs, pursuant to the JPL Appointment Orders. In addition, the powers of the orders include, but are not limited to, evaluating and providing critical input on the proposed Restructuring and supporting filings and applications to the Bermuda Court. *See* ¶ 23.

(c)      **Location of the Debtors' Primary Assets.** The primary assets of the Public Fund, the Private Fund, and the Reinsurer include amounts held in bank accounts held with HSBC in Bermuda. Further, the Debtors maintain the majority of their bank accounts in Bermuda. The Manager's primary assets include 100% of the voting stock of the Reinsurer and the Private Fund. The other Debtors also directly or indirectly hold shares in the Reinsurer. *See* ¶ 26. As noted in the George Declaration, the situs of shares in a Bermuda company is at the registered office of the company at which its register of members is kept. The situs of shares in a Bermuda company is therefore Bermuda. George Decl. ¶¶ 50, 70.

**V.      The Chapter 15 Petitions Comply with Chapter 15 of the Bankruptcy Code.**

56.      On the date hereof, in our capacities as Foreign Representatives, we caused to be

filed the Chapter 15 Petitions pursuant to Bankruptcy Code sections 1504 and 1515 commencing

the Chapter 15 Cases in the United States Bankruptcy Court for the Southern District of New York,

seeking recognition of the Bermuda Proceedings as "foreign main proceedings," as such term is

defined in Bankruptcy Code section 1502(4), or in the alternative as "foreign nonmain

proceedings," as such term is defined in Bankruptcy Code section 1502(5), and seeking other

necessary or appropriate relief in support of the Bermuda Proceedings.

57.    The Chapter 15 Petitions were accompanied by all fees, documents, and information that we are told by the Debtors' counsel are required by the Bankruptcy Code and the Bankruptcy Rules, including (a) a corporate ownership statement containing the information required by Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtors, (ii) all parties to litigation pending in the United States in which any of the Debtors are a party at the time of the filing of these chapter 15 cases, and (iii) all entities against whom provisional relief is being sought under Bankruptcy Code section 1519; (c) a statement identifying all foreign proceedings with respect to the Debtors that are known to the Foreign Representatives; and (d) certified copies of the JPL Appointment Orders.

58.    Accordingly, I believe that recognition of the Bermuda Proceedings as "foreign main proceedings" is consistent with the purpose of chapter 15.

### STATEMENT PURSUANT TO BANKRUPTCY CODE SECTION 1515

59.    I am informed by the Debtors' legal advisors that Bankruptcy Code section 1515 provides, in pertinent part, as follows:

> (a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.
>
> (b) A petition for recognition shall be accompanied by—
>
>> (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
>>
>> (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
>>
>> (3) in the absence of evidence referred to in paragraphs 1) and 2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

> (c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

11 U.S.C. § 1515(a)–(c).

60.     As discussed above, I am advised that the JPL Appointment Orders constitute a decision of the Bermuda Court commencing the Provisional Liquidation Proceedings and appointing the JPLs as the foreign representatives. JPL Appointment Orders ¶ 3(j) (ordering that the JPLs have the power "to act as the [Debtors'] agent and representative in proceedings in such other jurisdictions as the JPLs deem necessary or appropriate in furtherance and support of the Restructuring [ ], including proceedings under [c]hapter 15 of the U.S. Bankruptcy Code . . .; to seek any relief available to a "foreign representative" under chapter 15 of the U.S. Bankruptcy Code . . .; and to take such other action in the United States of America or elsewhere as deemed necessary or appropriate in furtherance and support of the Restructuring [ ]").

61.     Pursuant to Bankruptcy Code section 1515(c), I am aware of the definition of a "foreign proceeding" under Bankruptcy Code section 101(23), and, as set forth above, I believe that the Bermuda Proceedings are "foreign proceedings" as defined therein. I am aware of no other foreign proceedings with respect to the Debtors.

### DISCLOSURE PURSUANT TO BANKRUPTCY RULE 1007(a)(4)

62.     I am informed by the Debtors' legal advisors that Bankruptcy Rule 1007(a)(4) provides, as follows:

> In addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the Code.

Fed. R. Bankr. P. 1007(a)(4).

63.    I am further informed by the Debtors' legal advisors that Bankruptcy Rule 7007.1

provides, in pertinent part, that a corporate ownership statement:

> identif[y] any corporation, other than a governmental unit, that directly or indirectly
> owns 10% or more of any class of the corporation's equity interests, or states that
> there are no entities to report under this subdivision.

Fed. R. Bankr. P. 7007.1.

**I.    Consolidated Corporate Ownership Statement**

64.    In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(A), the

following is a corporate ownership statement of the Debtors, which identifies any corporation that

directly or indirectly owns 10 percent or more of any class of the Debtors' equity interests:[10]

    (a)    **Markel CATCo Reinsurance Fund Ltd.**[11]

        (i)    Certain pension funds managed by PKA A/S own approximately
40% of shares.

        (ii)    CATCo Reinsurance Opportunities Fund Ltd. owns approximately
12% of shares.

        (iii)    Markel CATCo Investment Management Ltd. owns 100% of
common shares.

    (b)    **CATCo Reinsurance Opportunities Fund Ltd.**[12]

        (i)    **Class C Shares:** Weiss Asset Management owns 33.79% and
Almitas Capital owns 24.90%.

        (ii)    **Ordinary Shares:** Almitas Capital owns 20.65%, Weiss Asset
Management owns 18.96%, Baillie Gifford owns 10.89%, and
Aberdeen Standard Investments owns 10.48%.

---

[10]    The Corporate Ownership Statement is further set forth in the Petition Form 401 for each Debtor, filed
contemporaneously herewith.

[11]    Ownership as of April 1, 2021.

[12]    Ownership as of June 30, 2021.

      (a)      **Markel CATCo Investment Management Ltd.**

          (i)     Markel Corporation, a Virginia company, indirectly owns 100% of common shares.

          (ii)    Alterra Capital Holdings Limited directly owns 100% of common shares.

      (b)      **Markel CATCo Re Ltd.**

          (i)     Markel CATCo Reinsurance Fund Ltd. owns 100% of preference shares.

          (ii)    Markel CATCo Investment Management Ltd. owns 100% of common shares.

Attached to the Chapter 15 Petitions as Schedule 1 to Exhibit A is an organizational chart reflecting all of the ownership interests of the Debtors and certain non-Debtor affiliates.

## II.   Persons or Bodies Authorized to Administer Foreign Proceedings of the Debtors

65.   As noted above, Mr. McKenna and I were appointed JPLs in the Bermuda Proceedings on October 1, 2021. In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(B), the JPLs shall maintain control of and be authorized to administer the Bermuda Proceedings. Our addresses are:

Simon Appell
Alix Partners UK LLP
6 New Street Square
London, EC4A 3BF
United Kingdom

John C. McKenna
Finance & Risk Services Ltd.
Suite 502, International Centre
26 Bermudiana Road
Hamilton, HM11
Bermuda

I am not aware of any other persons or bodies authorized to administer the Bermuda Proceedings on behalf of the Debtors.

### III.   Litigation Parties in the United States

66.   In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(A), as of the date of the filing of the Chapter 15 Petitions (the "**Petition Date**"), the Debtors are not parties to any litigation in the United States.

### IV.   Entities Against Whom Relief Is Being Sought Under Section 1519 of the Bankruptcy Code

67.   In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(A), as of the Petition Date, the Debtors are not seeking relief under Bankruptcy Code section 1519 against any entities.[13]

**WHEREFORE**, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:   London, United Kingdom
          October 5, 2021

*/s/ Simon Appell*
Simon Appell

---

[13]   The Debtors reserve the right to seek provisional relief under Bankruptcy Code section 1519 by separate motion.

1092796.08D-CHISR01A - MSW